[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-13124
Non-Argument Calendar
_____

Agency No. A087-309-222

OLUWA GBENGA ROTIMI AWOLEYE,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(May 22, 2015)

Before HULL, MARTIN and ANDERSON, Circuit Judges.

PER CURIAM:

Oluwagbenga Awoleye, a native and citizen of Nigeria, seeks review of the Board of Immigration Appeals's ("BIA") final order affirming the Immigration Judge's ("IJ") denial of his applications for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), and relief under the United Nations Convention Against Torture ("CAT").  On appeal, Awoleye argues: (1) that the BIA improperly affirmed the discretionary denial of his asylum claim based on Awoleye's 2013 conviction for marriage fraud; and (2) that substantial evidence does not support the BIA's denial of his requests for asylum, withholding of removal, and CAT relief.  After review, we deny the petition for review.

## I.  BACKGROUND FACTS

### A.    Initiation of Removal Proceedings

Awoleye first entered the United States on a student visa in 2003 or 2004. Awoleye was a track and field athlete who attended several universities in the United States on athletic scholarships.  He was also invited to participate in the 2008 Olympic trials, and was a member of the Nigerian Olympic team in the 2008 Olympics in Beijing.

Awoleye was last paroled into the United States in August 2008.  Awoleye's most recent immigrant status expired on August 10, 2009.

On September 15, 2009, the Department of Homeland Security issued Awoleye a Notice to Appear ("NTA").  The NTA charged that Awoleye had not

2

been granted or adjusted to any status that would allow him to remain in the United States and that he was removable under INA § 212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I) because he was an immigrant who was not in possession of a valid unexpired visa, reentry permit, border crossing card, or other valid entry document, and a valid unexpired passport, other suitable travel document, or document of identity and nationality. At a preliminary hearing in May 2010, Awoleye admitted the allegations in the NTA and conceded that he was removable as charged.

## B.    Asylum Application

In October 2010, Awoleye filed an application for asylum, withholding of removal, and relief under CAT. Awoleye's asylum application claimed that he and his family had been threatened with death by the Northern Nigerian Islamic Fundamentalist Group ("NNIFG") because his father, a Christian minister, refused to stop preaching in Jos, Plateau State, Nigeria.

Awoleye has seven siblings, four sisters—Oluwafunmilayo, Oluwatofunmi, Oluwabosede, and Oluwasun—and three brothers—Oluwashola, Oluwafemi, and Oluwatosin. According to Awoleye's asylum application and supporting documents: (1) beginning in December 2009, the NNIFG sent his father threatening letters, threatened to "wipe out" Awoleye's entire family, and burned down his father's church and home; (2) sometime prior to the 2009 threatening

3

letters, his mother survived an attack by unknown men who shot her three times; (3) his uncle survived a separate attack by unknown assailants; (4) the NNIFG killed two of Awoleye's siblings on April 24, 2010 and two other siblings on June 28, 2010; (5) a third brother was missing since July 4, 2010; (6) the rest of Awoleye's family was in hiding in Nigeria; and (7) Awoleye's father warned him in June 2010 not to return to Nigeria to attend a track and field event because the NNIFG had threatened to hunt Awoleye down during the competition.

## C.    April 2011 Removal Hearing

On the day of the April 2011 merits hearing, Awoleye filed an updated asylum application that amended his earlier application, in relevant part, to state that his mother "was gun shot and survived."

At the merits hearing, the IJ heard testimony from Awoleye.  While testifying, Awoleye named different siblings who were killed by the NNIFG, and stated that the asylum application had mixed up the siblings' names.[1]  woleye also stated that his mother was shot with an arrow.  When the IJ questioned Awoleye about these discrepancies, Awoleye's attorney stated that they were her fault.  Her firm had confused the siblings' names on the application, and she had assumed that

---

[1]Awoleye's asylum application and one portion of his attached affidavit stated that Oluwafemi (a brother) and Oluwafunmilayo (a sister) were killed on April 24, 2010, and Oluwashola (a brother) and Oluwatofunmi (a sister) were killed on June 28, 2010.  In another portion of his affidavit, as well as at the hearing, Awoleye testified that Oluwafunmilayo and Oluwatofuni (the two sisters) were killed on April 24, 2010 and that Oluwashola and Oluwafemi (the two brothers) were killed on June 28, 2010.

4

when Awoleye said his mother had been shot, he meant shot with a gun, and had revised the application that morning at her office.

Finding that Awoleye had failed to carry his burden to present credible and consistent testimony, the IJ denied all requested relief. In discrediting Awoleye's testimony, the IJ identified a number of discrepancies between Awoleye's testimony and his asylum application. For example, Awoleye's asylum application stated the NNIFG had forced Awoleye to renounce his own belief in Christianity, whereas he testified at the hearing that the NNIFG wanted his father to stop preaching Christianity; and his amended asylum application said his mother was shot with a gun, but Awoleye testified she was shot with an arrow. The IJ also identified implausibilities in Awoleye's story and the lack of eyewitness statements or other corroborating evidence establishing that the NNIFG was responsible for his siblings' deaths.

Alternatively, the IJ concluded that Awoleye was not entitled to asylum on the merits because he had not established a well-founded fear of future persecution.[2] Because Awoleye had not met the lower burden of proof for asylum, the IJ concluded that Awoleye also was ineligible for withholding of removal. Finally, the IJ determined that Awoleye had not shown that Nigerian officials

---

[2]The IJ also concluded that Awoleye's asylum application was untimely, but the BIA never adopted or affirmed this finding, and we do not address it. See Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001) (stating that we review the BIA's decision "except to the extent it expressly adopts the IJ's opinion").

5

would seek to harm him or acquiesce in the NNIFG's attempts to harm him, and thus Awoleye was not entitled to CAT relief.

## D.    BIA Appeal and Remand

On appeal to the BIA, Awoleye argued, inter alia, that he had not received good counsel and that the inconsistencies between his asylum application and his hearing testimony occurred because Awoleye's attorney revised his asylum application on the morning of the removal hearing without Awoleye's knowledge. Awoleye submitted additional evidence, including, among other things: (1) two February 2011 newspaper articles indicating that, in addition to the NNIFG killing his four siblings, his mother and father were found dead along a road in Jos on January 31, 2011, after receiving threats from the NNIFG and (2) articles describing violence taking place in Northern Nigeria, including near Jos, and the radical Islamic group Boko Haram.

In April 2013, the BIA sustained Awoleye's appeal and remanded for further proceedings. The BIA, after noting the IJ's credibility finding and summarizing the evidence, stated that Awoleye's ineffective counsel claims essentially constituted a request for a remand. The BIA noted that the IJ's credibility determination was primarily based on inconsistencies between Awoleye's testimony and his application that may have been due to counsel's failure to review the application with Awoleye.

Given that the IJ's adverse credibility finding in turn supported the IJ's finding that Awoleye had not otherwise met his burden of proof, the BIA concluded that a remand was necessary for further development of the record and a new credibility determination. The BIA noted the articles documenting the deaths of Awoleye's parents and attributing the deaths to the NNIFG, but declined to address Awoleye's extensive new documentation or any of the remaining bases for the IJ's decision. Instead, the BIA remanded for the IJ to enter a new decision considering: (1) whether the record contained sufficient evidence establishing a substantial likelihood of future harm for purposes of asylum, withholding of removal, and CAT relief; and (2) whether internal relocation was reasonable.

## E. Awoleye's March 2013 Marriage Fraud Conviction

Prior to the second removal hearing, the parties submitted numerous documents, including a criminal judgment indicating that, in March 2013, Awoleye pled guilty to marriage fraud, in violation of 8 U.S.C. § 1325(c).[3] Awoleye's conviction was based on statements of his ex-wife, Donna Kemp, a U.S. citizen, who had filed an I-130 petition for Awoleye that was denied in 2008. Kemp told federal investigators that she married Awoleye after he promised her money from his Olympic winnings. The factual resume, issued in conjunction with Awoleye's

---

[3]In his written plea agreement, Awoleye recognized that his guilty plea might "have consequences with respect to immigration status," and affirmed he wanted to plead guilty "regardless of any immigration consequences . . . even if the consequence is his automatic removal from the United States."

written plea agreement, stated that: (1) Awoleye married a Nigerian citizen, Florence Nna, in January 2005, while both he and Nna were in the U.S. on student visas; (2) in July 2006, while still married to Nna, Awoleye entered into a sham marriage with Kemp to fraudulently obtain lawful permanent resident status; (3) during the entirety of the marriage to Kemp, Awoleye lived with Nna; and (4) at Awoleye's direction, Kemp filed an I-130 petition that falsely indicated that Kemp lived with Awoleye.

## F.    September 2013 Removal Hearing

At the second removal hearing in September 2013, Awoleye, now appearing pro se, testified that he married Nna, a lawful permanent resident of the United States, in the summer of 2011 and that they had four children together.

According to Awoleye, his parents were killed in Nigeria, and a newspaper article tied their deaths to the NNIFG, but Awoleye did not know personally how they had died.  Awoleye had four deceased siblings, and, according to a newspaper article he provided to the IJ, they also were killed by the NNIFG in two separate incidents in April and June of 2010.

The IJ asked Awoleye to spell the names of his siblings who had been killed, and Awoleye identified them as "Oluwafunmilayo Awoleye," "Abosede Awoleye," "Oluwashole Awoleye," and "Oluwasin Awoleye."  Awoleye could not remember the ages of his deceased siblings or whether his siblings were older or

8

younger than him.  He stated he was a middle child and explained that he did not know whether he was younger or older because "[w]e don't celebrate the birthday like, like people do."  When the IJ asked him which siblings went to school first, Awoleye stated that he used to remember this information but a lot of things had happened since Awoleye came to the United States.

The IJ examined Awoleye's documents regarding the deaths of his siblings and asked Awoleye if his sister Oluwabosede (or "Abosede") had been killed. Awoleye responded that Oluwabosede had not been killed.  He said that Oluwafunmilayo and Oluwashola had been killed.  The IJ asked if Oluwatosin had been killed.  Awoleye responded, "That was one I was missing from the, from the beginning, Your Honor."  Awoleye stated that two of the siblings who were killed were Oluwafunmilayo and Oluwafemi.  The two males that were killed were Oluwashola and Oluwafemi.  The IJ asked if Awoleye understood that these names were different than the names he had just provided during his testimony, and Awoleye responded that he was tired and was "just trying to wake up," as he had been sitting at a computer "[o]utside at the gate here" the previous night.

Awoleye stated that he was never harmed in Nigeria, and he last came back to the United States from Nigeria in August 2008.  Awoleye filed his asylum application in 2010, after he called his father, who told him of his family's recent difficulties in Nigeria and advised him not to return.  Awoleye initially stated that

his father told him a "[c]ouple of weeks" before a Nigerian track and field event set for mid-to-late June that if he returned to Nigeria for the event he might be killed. Awoleye and the IJ then engaged in an extended discussion to try to determine precisely when this telephone call took place. Awoleye repeatedly stated he could not remember the precise date, but when the IJ pressed him and asked for his "best estimate," Awoleye said the call occurred sometime in mid-May.

Awoleye said that his father told him that he was attacked by Muslims for preaching in the Christian community in Jos. Awoleye explained that while Jos is majority Christian, it lies in the northern part of Nigeria, which is predominantly Muslim. Awoleye said that although the attacks occurred in northern Nigeria, the problems were beginning to spread to southern Nigeria.

Awoleye explained that in the first phone call, his father said only that he was having problems with Muslim extremists. Later, when Awoleye told his father he needed to return to Nigeria to make money at the track event, his father told him that his two sisters had been killed and that the extremists had found out Awoleye would be returning home because his name was in the newspaper.

The IJ asked Awoleye why, if the extremists wanted Awoleye's father to stop preaching, they were interested in Awoleye. Awoleye responded that four children were already lost and that the extremists indicated in a letter that he was next in line. The IJ asked Awoleye why the NNIFG killed Awoleye's siblings

10

after saying that they would kill his father.  Awoleye responded that the violence against his family was retaliation because his father would not stop preaching. Awoleye admitted he had never personally been contacted by the NNIFG.

Awoleye last spoke to his father in October 2010.  At that time, Awoleye's father said he would send documents to Awoleye about the attacks.  In 2011, Awoleye learned about his father's death through a Nigerian friend who had seen the newspaper article that Awoleye had provided to the IJ.  Awoleye said his parents were killed at the same time, but agreed he did not know anything about their killings other than what he had read in the newspaper.  Awoleye continued to believe that someone would harm him if he returned to Nigeria.  The IJ noted that Awoleye's father was no longer preaching and asked why the NNIFG would still be interested in Awoleye.  Awoleye indicated he was afraid because he had been identified as a target in one of the NNIFG's letters.

With respect to the earlier attack on his mother, Awoleye testified that, in 2010, she was "dragged out" and the attackers shot her "when the fire burn[ed] out."  Awoleye's father told him that the attackers shot his mother with a bow and arrow.

When the IJ asked Awoleye about inconsistencies in his asylum application, Awoleye responded that his previous attorney had typed his application, and he had merely signed the statement afterward.  Awoleye said that he did not see the

11

application until he got to court.  The IJ noted that Awoleye had signed his application on October 1, 2010, before the first removal hearing, which was inconsistent with Awoleye's current testimony.  Awoleye said that he wrote the statement down for his attorneys, who typed up the statement and sent him only the last page to sign.  Later, however, Awoleye admitted he received the entire asylum application from his lawyers, but his lawyers told him he only needed to print and sign the last page, and he did not look at the entire document before signing it.

The IJ also asked Awoleye about his marriage fraud conviction.  Awoleye testified that he had pled guilty to marriage fraud in 2012, but insisted he was not guilty and had pled guilty because he was in deportation proceedings and was afraid that he would never get to see his children again.  Awoleye stated that his marriage to Kemp was legitimate, but he was living with and had children with his present wife during the marriage to Kemp.

With respect to his ability to relocate in Nigeria, Awoleye said he did not know if anything had happened to his remaining siblings who still lived in Nigeria.  Awoleye stated he could not move to southern Nigeria because he did not know any of his extended family.  He did not think that it was safe for him to return even to southern Nigeria because the government was unable to curb the ongoing violence.

## G.    IJ's Decision

The IJ denied Awoleye's application, again finding that Awoleye had not met his burden of presenting credible and consistent testimony and documents in support.  The IJ stressed Awoleye's inconsistent hearing testimony about which siblings were killed and Awoleye's inability to state whether he was older or younger than his siblings.  **[Id.]**  The IJ indicated that he had observed Awoleye's demeanor and listened to Awoleye's explanations for discrepancies and had the "distinct impression" that Awoleye "was not being accurate or truthful . . . ."

The IJ further found that the discrepancies between Awoleye's application and his testimony more likely were caused by Awoleye's changed testimony than by ineffective assistance of counsel.  The IJ noted that Awoleye testified he had signed his sworn asylum statement the day of his first removal hearing, but the date on the statement indicated he had in fact signed it on a prior date.  When confronted with this evidence, Awoleye first changed his testimony to say that he had been sent only the last page to sign, and then testified that he had been sent the entire application, but had signed the last page without reading it.  Thus, the IJ gave little credence to Awoleye's claim that he had not read the entire application.

Overall, the IJ found the record was "replete with inconsistencies."  The IJ cited as examples Awoleye's application, which stated Awoleye's mother was shot, while Awoleye testified she was attacked with a bow and arrows, and

13

Awoleye's initial statement, which listed two sisters alive in Nigeria, when Awoleye testified that he did not know his sisters' whereabouts. Although Awoleye attempted to "explain away" inconsistencies by saying he was tired or blaming the problem on his attorney, the IJ found that Awoleye was "not being candid with the Court" and his explanations were unconvincing Additionally, Awoleye's conviction for marriage fraud raised serious issues as to his credibility. The IJ denied all of Awoleye's applications for relief because he had failed to present a credible and consistent account of his claim.

Alternatively, the IJ stated that he would deny Awoleye's future persecution claim on the merits. The IJ found that Awoleye's claim was based on his family relationship, rather than on anything Awoleye had done. That is, the Islamic extremists in Nigeria had targeted Awoleye because his father would not stop preaching. Nothing in the record suggested that the extremists had any continuing interest in Awoleye now that his father was no longer preaching. Awoleye had not had contact with the extremists, and there was no indication that his remaining siblings in Nigeria had come to any harm or that there were any more threats after their father's death in 2011. The IJ also noted that Awoleye had not shown that he could not live in the southern part of Nigeria without being exposed to the harm he feared.

14

Because Awoleye had not met the lower burden of proof with respect to asylum, the IJ also denied Awoleye's application for withholding of removal on the merits. The IJ further denied CAT relief because Awoleye failed to establish that anyone associated with the government or acting with the government's acquiescence or consent would seek to torture him. Finally, the IJ explained that Awoleye's marriage fraud conviction demonstrated that he did not deserve the favorable exercise of discretion. Thus, to the extent Awoleye was otherwise eligible for asylum, the IJ alternatively denied his asylum request as a matter of discretion.

## H.    BIA Appeal

Awoleye appealed to the BIA, challenging the IJ's credibility finding and merits rulings. Awoleye also argued that the IJ was biased against him and had not given proper consideration to his new evidence on remand. With respect to the discretionary denial of asylum, Awoleye contended that he had pled guilty on the bad advice of his defense attorney, who should have moved to dismiss the indictment based on the statute of limitations.

The BIA affirmed the IJ's denial of Awoleye's applications. In relevant part, the BIA noted the IJ's explicit credibility finding against Awoleye based on: (1) inconsistencies regarding which of Awoleye's siblings were killed in Nigeria; (2) changes in Awoleye's testimony regarding when he had signed and reviewed

15

his asylum application; and (3) inconsistencies surrounding Awoleye's testimony about when he learned that his siblings were killed.

The BIA concluded that the IJ's credibility finding was not clearly erroneous. The BIA highlighted that Awoleye's asylum application identified his deceased siblings as Oluwafunmilayo, Oluwatofunmi, Oluwashola, and Oluwafemi, but at the removal hearing he had testified that his deceased siblings' first names were "Oluwashole," "Oluwasin," "Oluwafumilayo," and "Abosede." When the IJ questioned Awoleye about this discrepancy, he changed his testimony and explained that he was tired, but both his explanation before the IJ and his explanation on appeal—that his siblings' names were easy to confuse—were unconvincing. Furthermore, Awoleye only corrected the names of his deceased siblings after the IJ pointed out the discrepancy. The BIA also stressed that, even assuming Awoleye might not know the age of each of his siblings, it was reasonable to expect Awoleye to know his birth order within his family. With respect to Awoleye's siblings, the IJ "had the distinct impression that the respondent was not being accurate and truthful with the Court," and the BIA determined that this observation of demeanor was entitled to deference.

The BIA also affirmed the IJ's adverse credibility findings as to whether the inconsistencies in Awoleye's asylum application were attributable to errors by his counsel, when Awoleye learned of his siblings' deaths, and when he had last

spoken with his father, stressing the IJ's observations of demeanor and Awoleye's changing testimony. The BIA concluded that, under the totality of the circumstances, Awoleye failed to credibly establish his eligibility for asylum.

The BIA also affirmed the IJ's alternative holding that Awoleye did not show a well-founded fear of future persecution. The BIA pointed out that, according to Awoleye, his siblings were killed to put pressure on his father, but his father was now dead. Awoleye failed to provide sufficient evidence that the NNIFG would be interested in harming Awoleye "4 years after killing his siblings, and 3 years after killing his father."

The BIA recognized Nigeria's current problems with Boko Haram, but concluded that Awoleye failed to demonstrate that Boko Haram would be interested in him if he returned to the country. Similarly, Awoleye failed to provide evidence showing that he could not relocate from northern to southern Nigeria, as his only evidence on this point was that he did not know his family in southern Nigeria. The BIA noted that the U.S. Department of State's 2012 Human Rights Report for Nigeria indicated that many Christians were relocating to southern Nigeria.

The BIA affirmed the discretionary denial of asylum. The BIA noted that Awoleye argued only that his marriage fraud conviction was invalid, and did not "otherwise [make] a meaningful argument regarding why the alternative

17

discretionary denial was incorrect." The BIA explained that it did not have jurisdiction to determine the validity of Awoleye's underlying conviction. The BIA also rejected Awoleye's claims that the IJ was biased against him.

The BIA determined that Awoleye had not met his burden of proof with regard to asylum, and he therefore also failed to meet his higher burden of proof for withholding of removal. Finally, the BIA found that Awoleye had not demonstrated that it was more likely than not that he would be tortured if returned to Nigeria, and, thus, he was not entitled to CAT relief.

## II.  DISCUSSION

### A.    Asylum

The IJ denied Awoleye asylum on two separate grounds: (1) Awoleye failed to prove he was statutorily eligible for asylum; and (2) even if Awoleye was statutorily eligible, his asylum request should still be denied as a matter of discretion because of his marriage fraud conviction. Even if an alien otherwise establishes eligibility for asylum, the actual grant of asylum is a matter of discretion that lies with the Attorney General. Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1231 (11th Cir. 2005). The discretionary denial of asylum is "conclusive unless manifestly contrary to the law and an abuse of discretion." INA § 242(b)(4)(D), 8 U.S.C. § 1252(b)(4)(D).

18

On appeal, Awoleye argues both that he proved his statutory eligibility for asylum and that he merits asylum as a matter of discretion.  Because we conclude that Awoleye has not shown that the discretionary denial of asylum was manifestly contrary to the law and an abuse of discretion, we do not reach the merits of Awoleye's asylum claim.[4]

The discretionary decision whether to grant or deny asylum requires consideration of the totality of the circumstances, in which adverse factors are balanced against favorable ones.  See Matter of Pula, 19 I. & N. Dec. 467, 474 (BIA 1987).  In exercising its discretion, the BIA must, after determining the asylum applicant has a prior conviction, "consider all evidence in support of the alien's request" and in particular "must evaluate the nature and underlying circumstances of the applicant's conviction in order to determine the weight it should accord to this adverse factor."  Martinez-Benitez v. I.N.S., 956 F.2d 1053, 1055 (11th Cir. 1992).  Further, the asylum applicant's "guilty plea constitutes an admission of all the elements of a formal criminal charge."  Id. at 1056 (quotation marks omitted).

It is undisputed that Awoleye pled guilty to marriage fraud in connection with his 2006 marriage to Kemp.  Under 8 U.S.C. § 1325(c), the crime of marriage fraud is committed by "[a]ny individual who knowingly enters into a marriage for

---

[4]Contrary to Awoleye's argument, the BIA did not deny his CAT claim as a matter of discretion, only his asylum claim.

the purpose of evading any provision of the immigration laws . . . ."  8 U.S.C. § 1325(c).  Thus, by pleading guilty, Awoleye admitted attempting to fraudulently evade the immigration laws.[5]  Moreover, Awoleye's signed plea agreement indicated that he entered into a sham marriage with Kemp to obtain lawful permanent resident status; that when he entered into the sham marriage, he was already married to, and living with, a Nigerian woman; and that he had Kemp file a false I-130 petition stating that he lived with Kemp.

Awoleye's only exhausted argument is that he should have received a favorable exercise of discretion because his marriage fraud conviction is invalid.[6]  Specifically, he contends that his criminal indictment should have been dismissed based on the statute of limitations.  Awoleye, however, does not contend that his marriage fraud conviction was overturned, much less that he appealed it.  Thus his conviction remains final for immigration purposes and could not be collaterally attacked in his immigration proceedings.  See Mohammed v. Ashcroft, 261 F.3d 1244, 1251 (11th Cir. 2001) (explaining that the alien may not collaterally attack his underlying conviction in his immigration proceedings); Zinnanti v. I.N.S., 651

---

[5]Awoleye does not argue that his guilty plea was involuntary or that he was not advised of the immigration consequences that might result from his guilty plea.

[6]To the extent Awoleye now challenges the IJ's balancing of the favorable and unfavorable factors, Awoleye did not raise this argument before the BIA, but instead argued only the validity of his marriage fraud conviction.  We lack jurisdiction to address unexhausted claims.  See 8 U.S.C. § 1252(d)(1); Amaya-Artunduaga v. U.S. Att'y Gen., 463 F.3d 1247, 1250 (11th Cir. 2006).

20

F.2d 420, 421 (5th Cir. Unit A July 1981) (concluding that immigration authorities may not look behind the judicial record of final conviction to determine the validity of a guilty plea).[7]  Awoleye has not shown that the discretionary denial of asylum on the basis of Awoleye's marriage fraud conviction was manifestly contrary to the law and an abuse of discretion.

## B.    Withholding of Removal

To establish eligibility for withholding of removal, an applicant must show that his life or freedom would be threatened in the country of removal because of his race, religion, nationality, membership in a particular social group, or political opinion.  INA § 241(b)(3), 8 U.S.C. § 1231(b)(3).  To meet this standard, the applicant bears the burden of showing that it is "more likely than not" that he will be persecuted or tortured on account of one of the five protected grounds. Sepulveda, 401 F.3d at 1232; 8 C.F.R. § 208.16(b)(2).

Although an adverse credibility determination alone may support a denial of withholding of removal, if the applicant produces evidence other than his testimony, the IJ and the BIA must consider this evidence as well.  See Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1287 (11th Cir. 2005).  In making an adverse credibility finding, the IJ must offer "specific, cogent reasons" for the finding.

---

[7]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Circuit adopted as binding precedent all decisions by the former Fifth Circuit handed down before October 1, 1981.

Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1255 (11th Cir. 2006) (quotation marks omitted).  The IJ, in evaluating credibility, must consider the "totality of the circumstances," including (1) demeanor, candor, or responsiveness of the applicant; (2) the inherent plausibility of the applicant's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which such statements were made); (3) the internal consistency of each such statement; (4) the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions); and (5) any inaccuracies or falsehoods in such statements, "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor."  INA § 208(b)(1)(B)(iii), 8 U.S.C. § 1158(b)(1)(B)(iii);[8] see also Chen v. U.S. Att'y Gen., 463 F.3d 1228, 1233 (11th Cir. 2006).  "Once an adverse credibility finding is made, the burden is on the applicant alien to show that the IJ's credibility decision was not supported by

---

[8]Although 8 U.S.C. § 1158 governs asylum claims, 8 U.S.C. § 1231(b)(3)(C) provides that the IJ's credibility findings for purposes of determining eligibility for withholding of removal are governed by § 1158(b)(1)(B).  Awoleye's withholding of removal claim is subject to the REAL ID Act's amendments to § 1158 because his application was filed after the amendments took effect on May 11, 2005.  See REAL ID Act of 2005, Pub. L. No. 109-13, § 101(h)(2), 119 Stat. 231, 305.

specific, cogent reasons or was not based on substantial evidence." Ruiz, 440 F.3d at 1255 (quotation marks and brackets omitted).[9]

Here, the IJ and the BIA gave specific, cogent reasons for finding Awoleye not credible, and those reasons are supported by substantial evidence.   In particular, the IJ and the BIA stressed Awoleye's inability to consistently identify which of his siblings were killed, the ages of any of his siblings, or even his birth order within his family.  Awoleye stated in his asylum application that two of his deceased siblings were Oluwafunmi and Oluwafemi, but at the second removal hearing, he omitted these names and testified that the NNIFG had killed "Abosede" and "Oluwasin," the two sisters his asylum application stated were alive in Nigeria. Awoleye did not correct his mistake until it was pointed out by the IJ and he was allowed to review his asylum application.  And, his only explanation for this mistake was that he was tired.  Similarly, when the IJ pressed Awoleye on his inability to recall his siblings' ages and whether they were older or younger than he was, Awoleye's only explanations were that his family did not observe birthdays and that a lot had happened to him in the United States.  As both the IJ and the BIA

[9]The BIA affirmed the IJ's adverse credibility finding and expanded upon the IJ's reasoning.  Thus, we review the IJ's credibility finding as supplemented by the BIA.  See Savoury v. U.S. Att'y Gen., 449 F.3d 1307, 1312 (11th Cir. 2006).  Credibility findings, like all factual determinations, are reviewed under the substantial evidence test.  Mohammed v. U.S. Att'y Gen., 547 F.3d 1340, 1344 (11th Cir. 2008).  Our review of credibility determinations is "highly deferential" and we "may not substitute our judgment for that of the Board."  Id. at 1344-45 (quotation marks and brackets omitted).  We will overturn a credibility finding only if the record compels it.  See id.at 1345.

emphasized, even assuming Awoleye might not know the ages of his siblings, it was reasonable to expect that he would have at least some idea of whether his siblings with whom he grew up were older or younger than he was, especially given that some of his deceased siblings were not close to him in age.[10]

While Awoleye contends he offered plausible explanations, the IJ was not required to accept them, especially given that the IJ specifically found that during this portion of Awoleye's testimony, his demeanor suggested he was not being candid.  In any event, we cannot say these explanations compel a conclusion that Awoleye was credible.  See Chen, 463 F.3d at 1233 (concluding that a tenable explanation for an inconsistency, alone, does not compel a conclusion that the applicant is credible).

The IJ and the BIA also correctly noted that Awoleye gave changing testimony regarding receiving, reading, and signing his asylum application, and the IJ found Awoleye's demeanor during this testimony indicated he was not being candid.  Given that Awoleye was attempting to explain other inconsistencies between his asylum application and hearing testimony, Awoleye's inability to consistently explain how and when he reviewed the application is a specific,

---

[10]According to Awoleye's asylum application, Awoleye was born in 1982, whereas his deceased siblings were born in 1979, 1985, 1987, and 1990.

cogent reason for discrediting him, and one that Awoleye has not made any significant effort to rebut.[11]

Another inconsistency noted by the IJ was Awoleye's claim that the NNIFG burned down his father's church—the Foursquare Gospel Church in Jos—in March 2010, but two of the threatening letters the NNIFG purportedly sent to Awoleye's father were sent to that church in May and June 2010, months after the NNIFG had already burned it down. Similarly, the obituary notices for Awoleye's deceased family members—which list their dates of death as occurring in April and June 2010—also reference the Foursquare Gospel Church in Jos. In addition, Awoleye submitted documentation indicating that his father reported the deaths of his four children to the police, but these documents make no mention of the threats his father received from the NNIFG.

The IJ noted the inconsistency between Awoleye's asylum application, which stated that his mother was shot with a gun, and Awoleye's hearing testimony, which was that his mother was shot with a bow and arrow. Even putting aside the gunshot versus bowshot inconsistency, Awoleye was inconsistent

_____

[11]Awoleye repeatedly argues that the inconsistencies relied upon to discredit him are inconsequential or do not go to the heart of his claims. However, an adverse credibility finding may be based on any inconsistency, regardless of whether the inconsistency goes to the heart of the applicant's claim. See 8 U.S.C. § 1158(b)(1)(B)(iii); Tang v. U.S. Att'y Gen., 578 F.3d 1270, 1277 (11th Cir. 2009).

about whether his mother was shot three times or once and whether she was shot in 2010 or before his father began receiving the threatening letters in 2009.

The BIA noted that Awoleye gave inconsistent statements about when he spoke to his father and learned of his siblings' deaths in 2010. During his hearing testimony, Awoleye initially said he spoke to his father one or two weeks before the mid-to-late June track event, then said the call occurred in mid-May, and a few minutes later stated that his father told him of his sisters' deaths in "mid-April – May," and that his talking to his father "ran into June," when his two brothers were killed.

Finally, there is Awoleye's marriage fraud. As the IJ explained, the fact that Awoleye has already attempted to fraudulently obtain lawful permanent resident status by entering into a sham marriage with a United States citizen and then having his wife file a false I-130 petition on his behalf seriously undermines Awoleye's credibility.

In sum, the discrepancies and implausibilities identified by the IJ and the BIA, the IJ's observations of Awoleye's equivocal and less-than-candid demeanor, and Awoleye's conviction for marriage fraud all amply support the adverse credibility finding. Awoleye does not contend that the other evidence in the record, without his discredited testimony, compels a conclusion that it is more likely than not that he will be persecuted by the NNIFG if he returns to Nigeria.

26

Accordingly, in light of the IJ's credibility finding, substantial evidence supports the denial of Awoleye's request for withholding of removal.

Even if Awoleye were deemed credible, substantial evidence also supports the alternative finding that Awoleye's future persecution claim failed on the merits. Awoleye's own testimony established that the NNIFG targeted him because of his father's preaching, rather than because of Awoleye's own religious beliefs, and that Awoleye had not received any threats or learned of any violence against his family in the seventeen months since his father's death.

Furthermore, substantial evidence supports the finding that Awoleye failed to meet his burden of showing that he could not reasonably relocate to southern Nigeria. See 8 C.F.R. § 208.16(b)(2), (b)(3)(i) (providing that an applicant cannot show a well-founded fear of future persecution if the IJ "finds that the applicant could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so" and placing the burden to show relocation would not be reasonable on the applicant). At his removal hearing, Awoleye admitted that all the violence against his family occurred in northern Nigeria. Country evidence in the record indicates that religious unrest and violence have occurred in northern Nigeria, which is dominated by Muslim ethnic groups. As a result, many Christians have fled to southern Nigeria, which is

27

predominantly Christian, to escape the religious violence in the North. Awoleye's only justification for not moving to southern Nigeria was that he did not know his extended family there. Thus, substantial evidence supports the finding that Awoleye's testimony, if credited, did not establish statutory eligibility for withholding of removal.

## C.    CAT Claim

To be eligible for CAT relief, an applicant must establish that it is more likely than not that he would be tortured if removed to the proposed country of removal. 8 C.F.R. § 208.16(c)(2); Reyes-Sanchez v. U.S. Att'y Gen., 369 F.3d 1239, 1242 (11th Cir. 2004). The applicant must demonstrate that the torture would be inflicted by the government or with its acquiescence. Reyes-Sanchez, 369 F.3d at 1242; Rodriguez Morales v. U.S. Att'y Gen., 488 F.3d 884, 891 (11th Cir. 2007); see also 8 C.F.R. § 208.18(a)(1) (requiring that the torture be "inflicted by or at the instigation of or with the consent or acquiescence of" a government official).

For the same reasons that Awoleye failed to carry his burden with respect to withholding of removal under the INA, Awoleye also did not show that it is more likely than not that he would be tortured within the meaning of CAT if he was removed to Nigeria. See 8 C.F.R. § 208.18(a)(1); Reyes-Sanchez, 369 F.3d at 1242. Furthermore, Awoleye presented no evidence that any harm he fears would

28

be inflicted by, or with the acquiescence of, the Nigerian government. Neither the NNIFG nor Boko Haram is part of the Nigerian government, and none of the evidence Awoleye submitted suggests that either group is acting with the acquiescence of the Nigerian government. Thus, substantial evidence supports the BIA's denial of CAT relief.

For all the foregoing reasons, we deny Awoleye's petition for review.

**PETITION DENIED.**