**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 8, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

KYAW MYAT HTUN,

    Petitioner,

v.

No. 15-9533

LORETTA E. LYNCH, United States
Attorney General,

    Respondent.

_____

**Appeal from the Board of Immigration Appeals**
**(Petition for Review)**
_____

Submitted on the briefs:[*]

Patrick Wang, New York, New York, for Petitioner.

Benjamin C. Mizer, Principal Deputy Assistant Attorney General; Terri J. Scadron, Assistant Director; Hillel R. Smith, Attorney, Civil Division, United States Department of Justice, Washington, D.C., for Respondent.

_____

Before **HARTZ**, **BALDOCK**, and **McHUGH**, Circuit Judges.

_____

**McHUGH**, Circuit Judge.

_____

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Petitioner Kyaw Myat Htun is a citizen of Burma who has lived in the United States for several years and seeks asylum and other forms of relief that would allow him to remain in the country. The immigration judge (IJ) initially granted Mr. Htun's asylum application but later reopened the removal proceedings and denied the application. Based on newly discovered evidence, the IJ concluded Mr. Htun lacked credibility and the circumstances did not warrant an exercise of discretion in favor of Mr. Htun's application. The Board of Immigration Appeals (BIA) affirmed the IJ's ruling and dismissed Mr. Htun's appeal. Mr. Htun now petitions this court for review of the BIA's decision. Exercising jurisdiction under 8 U.S.C. § 1252(a), we deny his petition.

## I.    BACKGROUND

Mr. Htun came to the United States in January 2002, as a nonimmigrant F-1 student, with authorization to remain in the country for a temporary period not to exceed the duration of his student status. Mr. Htun was specifically admitted to attend Salem International University, but he did not attend and instead remained in the country without authorization. In January 2003, Mr. Htun applied for asylum, withholding of removal, and relief under the Convention Against Torture (CAT).

In his asylum application, Mr. Htun claimed he was seeking relief based on persecution for his political opinions.[1] Mr. Htun explained that he had been associated

---

[1] Mr. Htun also indicated he was seeking asylum based on race. But the information provided in Mr. Htun's application—and the evidence introduced during his removal proceedings—related exclusively to his political activities. Mr. Htun did not introduce any evidence showing persecution based on his race and has not raised any arguments on appeal that relate to his race. We therefore limit our analysis to Mr. Htun's political opinions.

with anti-government student groups since 1994 and feared he would be arrested or otherwise harassed if he returned to Burma. To further support his application, Mr. Htun indicated his father had been arrested three times in Burma.

On November 25, 2003, an asylum officer interviewed Mr. Htun regarding his asylum application. During his interview, Mr. Htun stated that at the time he was a university student in Burma in 1996, he and other students organized a protest. In response, soldiers detained Mr. Htun and the other students.[2] Approximately two years later, in 1998, Mr. Htun again participated in a protest at his school. On this occasion, police contacted Mr. Htun's parents, who came to the school and took him home. After the 1998 events, Mr. Htun "fear[ed] further harm" from the government and therefore "fled from Burma and went to Singapore to attend school." After moving to Singapore, Mr. Htun returned to Burma five times between 1998 and 2002 and was able to enter and exit Burma without incident. Based on the interview, the asylum officer concluded Mr. Htun had not provided a credible explanation for his fear of persecution if he returned to Burma. The officer therefore determined Mr. Htun was not eligible for asylum and referred the application to the immigration court for removal proceedings.

On June 11, 2004, the Department of Homeland Security (DHS) served Mr. Htun with a Notice to Appear, which charged him as removable under section 237(a)(1)(B) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1227(a)(1)(B). Mr. Htun admitted

---

[2] Although the asylum officer's report states Mr. Htun was arrested, at his first evidentiary hearing before the IJ, Mr. Htun clarified that he was detained, not arrested.

the allegations in the Notice to Appear and conceded removability, but he continued pursuing his asylum application.

On March 2, 2006, while his removal proceedings were pending, Mr. Htun married a U.S. citizen named Melissa Burris, and Ms. Burris filed an I-130 Petition for Alien Relative on Mr. Htun's behalf. Mr. Htun moved to continue the hearing in his removal proceedings, based on the fact that the I-130 Petition had not been decided. The IJ granted the continuance.

### A.    *The Immigration Judge's Initial Decision*

After several continuances, the IJ held an evidentiary hearing on Mr. Htun's asylum application on January 5, 2010. At the beginning of the hearing, Mr. Htun informed the IJ that although he had previously filed an application for adjustment of status based on the I-130 Petition, he and Ms. Burris had since divorced. Mr. Htun did not provide any additional information about his marriage or the divorce.

Mr. Htun then testified with the help of an interpreter and repeated much of the information he had previously provided to the asylum officer. In particular, Mr. Htun reiterated that, as a student in Burma, he participated in anti-government demonstrations, resulting in one occasion where he and other students were detained overnight. Before being released, Mr. Htun claimed he was forced to sign a document saying he would no longer participate in political opposition. But Mr. Htun joined another demonstration the next day, was again detained, and was forced to sign a document agreeing not to participate in further demonstrations. Mr. Htun was not physically harmed during either detention.

4

Mr. Htun further testified that in 1998, he participated in a student protest, during which the government sprayed a large crowd of students, including Mr. Htun, with a fire hose. Mr. Htun described the experience as "very painful" but confirmed he was not otherwise injured. After Mr. Htun and the other students then locked themselves in their dormitory, the government gave the students an ultimatum to return home within seven days or the military would "come in and forcefully break up" the protest. Although the students returned home, Mr. Htun testified that several students "disappeared without any trace and incidentally two of [his] best friends were sentenced to seven years." Fearing similar retaliation from the government, Mr. Htun fled to Singapore in December 1998.

Mr. Htun stayed in Singapore until 2002 but returned to Burma five times during that period. Mr. Htun claimed that, when he visited Burma, he feared being arrested and therefore could not stay with his family; he instead "had to stay with friends here and there" for two or three days at a time. At the time of the hearing in January 2010, Mr. Htun stated he continued to believe he would be arrested if he returned to Burma.

Mr. Htun also called Tun Tun Oo as a witness. Mr. Oo testified that Mr. Htun stayed with him in Burma for three days during one of Mr. Htun's return visits from Singapore. After Mr. Htun left, Burmese officials questioned Mr. Oo about whether Mr. Htun had stayed with him. Mr. Oo denied that Mr. Htun had been there and the officials directed Mr. Oo to report to them if Mr. Htun showed up and "warned [Mr. Oo] that allowing [Mr. Htun] to stay with [him] could put [his] family in trouble." Mr. Oo explained that Mr. Htun was targeted by Burmese officials because he was a student leader.

The IJ found Mr. Oo credible and concluded his testimony corroborated Mr. Htun's statements regarding his need to evade the government when he made return visits to Burma. Relying on Mr. Oo's testimony, the IJ was "persua[ded] . . . that [Mr. Htun had] at least . . . a 10 percent chance of being in danger if he goes back to Burma." Although the IJ did not find Mr. Htun had been persecuted in the past, he concluded Mr. Htun had a well-founded fear of being persecuted if he were to return to Burma. The IJ therefore granted Mr. Htun's asylum application.

## B.    *The Immigration Judge's Revised Decision*

On January 26, 2010, DHS filed a motion to reopen Mr. Htun's removal proceedings based on material information not previously provided by Mr. Htun. Specifically, DHS argued Mr. Htun had failed to provide the full facts about his marriage to Melissa Burris and had failed to disclose his business relationship with Mr. Oo. Over Mr. Htun's objection, the IJ granted DHS's motion.

On May 14 and 15, 2013, the IJ held a second hearing on Mr. Htun's asylum application. Mr. Htun again testified about his political protests and detentions in Burma. He also reiterated that he fled to Singapore in December 1998 but returned to Burma five times between 1998 and 2002. His visits ranged from a few days to several weeks, and on one occasion, Mr. Htun stayed in Burma for over fifty days because his mother was ill.

Although Mr. Htun claimed Burmese officials had an active warrant for his arrest, he testified he avoided being arrested by traveling during busy tourist times because the Burmese government was "afraid [of] detaining [Mr. Htun] in front of the foreigners." But Mr. Htun also confirmed that each time he returned to Burma, he was interviewed by

6

customs officials yet never arrested. In addition, Mr. Htun admitted he renewed his passport at the Burmese embassy in Singapore without incident. When asked about the "two different Burmas" depicted in his testimony—one in which an oppressive government issued an arrest warrant based on his participation in student protests, and one in which he could freely enter and exit Burma without being arrested—Mr. Htun stated his belief that if the Burmese government had found him any time from 1998 to 2002, he would have been arrested. He conceded, however, that he does not know what the Burmese government would do now.

Mr. Htun also testified about his marriage to Ms. Burris. Mr. Htun confirmed that he filed a petition for a green card based on his marriage to Ms. Burris and upon further questioning, acknowledged he "entered into a marriage that [he] knew was not a true marriage for love and in an effort to obtain a green card." Mr. Htun similarly admitted he entered into the marriage "with the intent to obtain an [i]mmigration benefit" and did so "knowing the marriage was not a valid marriage for [i]mmigration purposes." Mr. Htun testified that when he married Ms. Burris, he was actually in a relationship with Ms. Burris's friend, who is the mother of Mr. Htun's child.

DHS also called Mr. Oo, who confirmed he was employed by Mr. Htun when he testified at the prior hearing. When asked why he had not disclosed the business relationship, Mr. Oo said no one had asked about it. But in response to an inquiry at the previous hearing about how he knew Mr. Htun, Mr. Oo stated only that he and Mr. Htun went to high school together and were friends. And when asked, "[W]hat are you doing

7

in the United States?" Mr. Oo answered that he was employed as a sushi chef at a grocery store, without mentioning that he worked for Mr. Htun.

On May 20, 2013, the IJ issued a written decision denying Mr. Htun's asylum application as a matter of discretion, denying Mr. Htun's application for withholding of removal, and denying relief under the CAT. As a threshold matter, the IJ determined Mr. Htun lacked credibility, based on numerous inconsistencies between Mr. Htun's application and his testimony at the different hearings. For example, Mr. Htun testified that, as a result of his political involvement in Burma, his father was arrested, his family's mail was monitored, and their phones were tapped. But Mr. Htun could not provide details regarding his father's arrests. And, in his asylum application, Mr. Htun did not claim his father was arrested as a result of any family member's political activities. Instead, Mr. Htun stated his father was arrested three times because he was a jewelry broker and the military intelligence arrested brokers "whenever [the] inflation rate is higher." The IJ also found a discrepancy between Mr. Htun's stated belief that he would be arrested if he returned to Burma and the evidence of multiple return visits while he lived in Singapore. Although Mr. Htun claimed the government had a warrant for his arrest, he was nonetheless able to travel to and from Burma five times without being arrested.

In addition to its adverse credibility determination, the IJ decided the circumstances justified a denial of Mr. Htun's application as a matter of discretion. In reaching that conclusion, the IJ identified both positive and negative factors relevant to Mr. Htun's application. On the positive side, the IJ recognized that Mr. Htun has a

8

daughter who is a U.S. citizen, owns a successful business, and lacks a recent and significant criminal history. Against these facts the IJ weighed negative factors, including Mr. Htun's admission that he committed marriage fraud, his failure to be "forthcoming with [the IJ] regarding the nature of his relationship to his only witness presented in support of his application," and his guilty plea to disorderly conduct after being charged with two domestic-violence offenses involving the mother of his U.S.-citizen child. After listing these factors, the IJ concluded,

> Due to [Mr. Htun's] marriage fraud, and failure to properly inform [the IJ] at his prior hearing about his marriage fraud and his business relationship to his witness, this Court finds [Mr. Htun] does not merit a favorable grant of discretion. For the above and foregoing, this Court denies [Mr. Htun's] asylum application.

The IJ also found Mr. Htun ineligible for withholding of removal because conditions had changed in Burma,[3] the evidence did not support Mr. Htun's claim that his family had been harassed because of his political activities, and Mr. Htun had been able to travel to and from Burma in the past without incident. Finally, the IJ denied relief under the Convention Against Torture, finding "no evidence in the record that [Mr. Htun] would be tortured, for any reason, as it is defined in CAT." Mr. Htun timely appealed the IJ's decision to the BIA.

---

[3] Mr. Htun argues that the IJ erred by failing to consider evidence—namely, Internet articles—that would have rebutted the government's evidence of changed conditions in Burma. The BIA did not consider changed circumstances in its decision, and, as explained below, our review is limited "to the grounds specifically relied upon by the BIA." *Uanreroro v. Gonzales*, 443 F.3d 1197, 1203–04 (10th Cir. 2006). Thus, we decline to consider the proposed evidence.

9

## C. *The BIA's Decision*

On March 9, 2015, in a single-member decision, the BIA dismissed Mr. Htun's appeal. The BIA concluded, "as the [IJ] found, the evidence [Mr. Htun] presented to the [IJ] was not consistent and credible." Like the IJ, the BIA found inconsistencies between Mr. Htun's testimony and the other evidence related to the arrests of Mr. Htun's father and Mr. Htun's return visits to Burma. The BIA also found it significant that Mr. Htun and his counsel did not disclose the fact that Mr. Oo was Mr. Htun's employee.

In addition to finding evidence supporting the IJ's credibility determination, the BIA independently weighed the relevant discretionary factors. The BIA recognized the factors weighing in Mr. Htun's favor, including that he has a daughter who is a U.S. citizen, owns a business in the U.S., does not have a significant recent criminal history, and has resided in the U.S. since 2002. Against these factors, the BIA considered Mr. Htun's fraudulent marriage and his guilty plea for disorderly conduct. Considering all of these factors, along with the adverse credibility determination, the BIA concluded, "Given the evidence presented, we agree with the [IJ] that [Mr. Htun] has not shown that he merits a favorable exercise of discretion in this case."

With respect to Mr. Htun's request for withholding of removal, the BIA determined that, even assuming Mr. Htun had presented credible evidence, he had not shown that he suffered persecution in Burma. Finally, the BIA declined to grant protection under the CAT because the evidence did not show that Mr. Htun would more likely than not be tortured if he returned to Burma.

10

## II.    DISCUSSION

On appeal of a BIA order, "[t]he scope of our review is governed by the form of the BIA decision." *Ritonga v. Holder*, 633 F.3d 971, 974 (10th Cir. 2011). Where, as here, a single BIA member issues a brief order affirming the IJ's decision, we review the order as the final agency determination and limit our review to the grounds relied upon by the BIA. *Uanreroro v. Gonzales*, 443 F.3d 1197, 1203–04 (10th Cir. 2006). But, "when seeking to understand the grounds provided by the BIA, we are not precluded from consulting the IJ's more complete explanation of those same grounds." *Id.* at 1204.

Our standard of review is further informed by the type of relief sought and the basis for the BIA's decision. When applying for asylum, an applicant must first prove he qualifies as a refugee under 8 U.S.C. § 1101(a)(42)(A). At this step, "[w]e review the [BIA's] factual findings of whether an alien is a refugee under the substantial evidence standard." *Kapcia v. INS*, 944 F.2d 702, 707 (10th Cir. 1991). If an alien establishes statutory eligibility as a refugee, the BIA then has discretion to grant or deny asylum. *Id.* at 708. "We review this second step of the [BIA's] discretionary grant or denial of asylum for abuse of discretion," recognizing that the agency's discretion is "extremely broad." *Id.* Our review is therefore "narrow" and limited to whether the agency's decision is "arbitrary and capricious." *Id.*

When an alien requests withholding of removal, he or she must prove persecution, which is a question of fact reviewed under the substantial-evidence standard. *Ritonga*, 633 F.3d at 974. Similarly, a request for protection under the CAT involves factual

11

determinations reviewed for substantial evidence. *See Ismaiel v. Mukasey*, 516 F.3d 1198, 1204–05 (10th Cir. 2008).

### A.      *Application for Asylum*

Here, the IJ initially determined Mr. Htun was eligible for asylum based on a well-founded fear of future persecution. The IJ later questioned that conclusion based on the new evidence at Mr. Htun's second hearing but ultimately denied Mr. Htun's application as a matter of discretion. And the BIA affirmed the discretionary denial of Mr. Htun's asylum application. Mr. Htun raises two challenges to this decision: (1) the BIA abused its discretion in finding Mr. Htun not credible; and (2) the BIA failed to properly weigh the discretionary factors in denying asylum.

### 1.      Credibility Determination

The IJ's credibility assessment is a factual finding, *Kabba v. Mukasey*, 530 F.3d 1239, 1244 (10th Cir. 2008), and "will ordinarily be given great weight," *Matter of Pula*, 19 I&N Dec. 467, 471 (1987), *superseded in part by regulations on other grounds as stated in Andriasian v. INS*, 180 F.3d 1033, 1043–44 & n.17 (9th Cir. 1999). As a factual finding, the IJ's credibility determination is reviewed for substantial evidence and should not be reversed "unless the record demonstrates that 'any reasonable adjudicator would be compelled to conclude to the contrary.'" *Estrada-Escobar v. Ashcroft*, 376 F.3d 1042, 1046 (10th Cir. 2004) (quoting 8 U.S.C. §1252(b)(4)(B)). Under this standard, we do not weigh evidence or independently assess credibility; rather, "[e]ven if we disagree with the [BIA's] conclusions, we will not reverse if they are supported by substantial evidence and are substantially reasonable." *Kapcia*, 944 F.2d at 707

The IJ determined after the second hearing that Mr. Htun lacked credibility. As it was required to do, the BIA deferred to the IJ's determination and noted the supporting evidence in the record. *See Kabba*, 530 F.3d at 1244, 1246 (holding BIA is required to apply a "deferential standard" and review the IJ's credibility determinations "for clear error, and only clear error"). The IJ's credibility conclusion, as confirmed by the BIA, was based on three areas of inconsistent or incomplete evidence. First, Mr. Htun testified that his political activities resulted in his father being arrested. But in his asylum application, Mr. Htun claimed his father was arrested because he was a jewelry broker, not because of Mr. Htun's political activities. Thus, there is substantial evidence supporting the IJ's finding that Mr. Htun's testimony on this point was inconsistent.

Second, Mr. Htun testified that he believes the Burmese Government has issued a warrant for his arrest and he therefore fears being arrested if he returns to Burma. But this alleged fear was contradicted by several facts for which there is substantial evidence in the record. In both hearings before the IJ, and in his interview with the asylum officer, Mr. Htun explained that after fleeing to Singapore in 1998, he was able to return to Burma five times, without being arrested. Mr. Htun claimed he entered at high-tourist times to take advantage of Burma's reluctance to arrest him in front of foreigners and stayed only briefly at different friends' homes to avoid being arrested while in the country. But the record also contains evidence that each time Mr. Htun came to Burma he was interviewed by a customs official and had to show his passport. And on one occasion, he remained in Burma without incident for over fifty days. Yet he was never arrested. Mr. Htun also renewed his passport at the Burmese embassy in Singapore

13

without being arrested. This evidence supports the IJ's determination that Mr. Htun lacked credibility when he described the danger of arrest if he returns to Burma.

Finally, the IJ and BIA concluded Mr. Htun and his counsel were not forthcoming about the business relationship between Mr. Htun and his sole witness, Mr. Oo. Mr. Htun's counsel attempts to explain the failure to disclose the relationship by asserting he did not have an opportunity to meet with the witness before the hearing. But even if counsel was unaware, Mr. Htun and Mr. Oo were fully informed and yet failed to disclose the nature of their current association, despite being asked directly how they knew each other. Indeed, when the IJ asked Mr. Oo where he worked, Mr. Oo responded that he worked as a sushi chef for a grocery store, conspicuously omitting that he was employed by Mr. Htun. This provided further substantial evidence in support of the IJ's negative credibility determination.[4]

With three separate areas where the evidence supports a finding of inconsistency and nondisclosure, a reasonable adjudicator would not be compelled to find Mr. Htun credible. As such, we will not reverse the IJ's and BIA's credibility determination.

---

[4] Because Mr. Htun filed his asylum application before 2005, the parties and the IJ agree this case is not governed by the REAL ID Act. Mr. Htun relies on this fact to argue that Mr. Oo's testimony should be presumed credible. The REAL ID Act eliminated the presumption of credibility that asylum applicants previously enjoyed and instead provides that, if the IJ does not make a credibility finding, the applicant is entitled to a rebuttable presumption of credibility. 8 U.S.C. § 1229a(c)(4)(C). Thus, because this is a pre-REAL ID Act case, Mr. Htun was entitled to a presumption of credibility. That presumption, however, was contradicted by substantial evidence in the record supporting the IJ's adverse credibility determination. The IJ specifically identified the bases for its assessment, and Mr. Htun has not provided any authority for the conclusion that we should disregard the IJ's determination merely because this is a pre-REAL ID Act case.

14

## 2. Discretionary Factors

"[I]n determining whether a favorable exercise of discretion is warranted," the BIA should consider "the totality of the circumstances and actions of an alien in his flight from the country where he fears persecution." *Matter of Pula*, 19 I&N Dec. at 473; *see also Matter of Edwards*, 20 I&N Dec. 191, 195 (1990) ("The exercise of discretion in a particular case necessarily requires consideration of all the facts and circumstances involved."). The BIA must balance "the social and humane considerations presented in an alien's favor against the adverse factors." *Matter of Edwards*, 20 I&N Dec. at 195. Favorable factors include family ties in the United States, long-term residence in the country, property or business ties, and "other evidence attesting to a respondent's good character." *Id.* On the other hand, adverse factors include the presence of significant violations of the immigration laws, the existence of a criminal record, and "the presence of other evidence indicative of a respondent's bad character." *Id.*

Mr. Htun asserts "both [the] IJ and the Board applied the wrong legal standard to determining the facts in denying Mr. Htun's asylum," arguing that the BIA improperly denied asylum based on the sole fact that he committed marriage fraud. Although Mr. Htun is correct that the BIA may not rely on a single fact in exercising its discretion, it did not do so here.

Rather, the BIA recognized both "favorable equities" and "adverse factors" related to Mr. Htun's application. Specifically, Mr. Htun has a daughter who is a U.S. citizen, he owns a business, he does not have a significant recent criminal history, and he has been in the country since 2002. On the other hand, Mr. Htun admitted that he committed

marriage fraud and failed to disclose the fraud during his initial hearing, and he pled guilty to disorderly conduct. In addition, the BIA noted that Mr. Htun's evidence "was not consistent and credible." Based on its consideration of these factors, along with its confirmation of the IJ's credibility assessment, the BIA concluded Mr. Htun was not entitled to a favorable exercise of discretion.

Significantly, Mr. Htun identifies the same relevant factors as provided in the BIA's decision,[5] but he maintains the BIA should have weighed the factors differently. In particular, Mr. Htun argues the negative factors in his case were not so significant that they outweighed the positive.

First, Mr. Htun, although admitting he committed marriage fraud, contends the fraud should not be a decisive factor because he acknowledged the wrongdoing. But the IJ and BIA are required to consider *all* circumstances, including negative ones. Moreover, other circuits to address this issue have considered marriage fraud a significant negative factor that supported discretionary denial of asylum. *See, e.g., Awoleye v. U.S. Att'y Gen.*, 608 F. App'x 868, 878 (11th Cir. 2015) ("Awoleye has not shown that the discretionary denial of asylum on the basis of [his] marriage fraud conviction was manifestly contrary to the law and an abuse of discretion."); *Aioub v. Mukasey*, 540 F.3d 609, 612 (7th Cir. 2008) (finding the IJ did not abuse its discretion in concluding

---

[5] Mr. Htun also identifies an additional positive factor, claiming that he has paid taxes every year since he entered the United States. Although Mr. Htun testified he has paid taxes, he did not submit tax returns for the IJ's consideration, claiming he did not know he should provide them. Without documentary evidence to confirm his testimony, neither the IJ nor BIA acted arbitrarily or capriciously in failing to identify the payment of taxes as a factor weighing in Mr. Htun's favor.

16

marriage fraud was "a significant negative factor" and denying asylum application as a matter of discretion).

With respect to his guilty plea for disorderly conduct, we agree with Mr. Htun that the IJ incorrectly stated he had committed domestic violence. But the BIA correctly acknowledged that although Mr. Htun was charged with domestic-violence offenses, he pled guilty only to disorderly conduct. Thus, the BIA properly considered Mr. Htun's actual criminal conviction in assessing the negative factors. *See Matter of Edwards*, 20 I&N Dec. at 195 (listing "existence of a criminal record" as an adverse factor).

The IJ and BIA considered the totality of the circumstances and concluded that Mr. Htun should be denied asylum as a matter of discretion. Although Mr. Htun would have us weigh the discretionary factors in his favor, we cannot conclude the BIA's decision was arbitrary and capricious.

### B.      *Withholding of Removal*

In addition to the option of asylum, the Attorney General may withhold removal if she determines "the alien's life or freedom would be threatened" in the country to which the alien would be removed "because of . . . race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). "The burden of proof for withholding of removal is higher than for asylum" and requires the applicant to prove a "clear probability of persecution on account of a protected ground." *Rodas-Orellana v. Holder*, 780 F.3d 982, 986, 987 (10th Cir. 2015) (internal quotation marks omitted). Persecution, in turn, "requires the 'infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive' and

17

requires 'more than just restrictions or threats to life and liberty.'" *Woldemeskel v. INS*, 257 F.3d 1185, 1188 (quoting *Baka v. INS*, 963 F.2d 1376, 1379 (10th Cir. 1992)). Although the IJ initially found Mr. Htun had demonstrated a well-founded fear of future persecution, after the second hearing, the IJ concluded Mr. Htun had not satisfied his burden.

To prove he had suffered persecution in the past, Mr. Htun relied on evidence of his student protest activities. In 1996, Mr. Htun was detained twice for his political protests, but he was not injured during either detention. Although Mr. Htun was sprayed with a fire hose during the 1998 demonstration, he went home afterward and was not further harmed. These experiences do not rise to the level of persecution. Indeed, in previous decisions we have upheld a finding of no persecution despite evidence of circumstances much more severe than those alleged by Mr. Htun. *See, e.g.*, *Sidabutar v. Gonzales*, 503 F.3d 1116, 1124 (10th Cir. 2007) (affirming BIA's finding of no persecution where Christian was repeatedly beaten and robbed at the hands of Muslim classmates); *Kapcia v. INS*, 944 F.2d 702, 704–05, 708 (10th Cir. 1991) (affirming BIA's finding of no persecution where petitioner was detained twice for two-day periods during which he was interrogated and beaten based on his political affiliation, was assigned poor work tasks and denied bonuses, was conscripted into the army where he experienced constant harassment, and was fired from his job).

The BIA's determination that Mr. Htun did not face a clear probability of persecution is further supported by Mr. Htun's own testimony that, shortly after his political activity, he entered and exited Burma at will. Mr. Htun was not harmed or

18

arrested during any of his visits. And nothing in the record suggests Mr. Htun would be harmed if he returned now, over a decade later.

In sum, there is substantial evidence supporting the BIA's decision that Mr. Htun is not eligible for withholding of removal.

## C.      *Convention Against Torture*

Under the CAT, Mr. Htun had the burden to prove "it is more likely than not that he . . . would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). Torture is defined as

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

*Id.* § 1208.18(a)(1).

When asked about his fear of being tortured, Mr. Htun asserted, "I will be arrested and sentenced [to] imprisonment by M.I. [military intelligence]." Mr. Htun also expressed concern that his family and friends would be harassed, solicited for bribes, and targeted in their businesses. Beyond these assertions, Mr. Htun did not present any evidence that he would experience an act of "severe pain or suffering" inflicted by or with the consent of a public official. To the contrary, even on the heels of his political activity, Mr. Htun was never tortured as that term is used in the CAT. And Mr. Htun has not presented any evidence to suggest Burmese officials are still pursuing him or that he

19

would be subject to harsher conditions if he returned to Burma now. Thus, Mr. Htun does not qualify for protection under the CAT.

## III.  CONCLUSION

For these reasons, we **DENY** Mr. Htun's petition for review of the BIA's order.