**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**February 25, 2026**

# UNITED STATES COURT OF APPEALS

# FOR THE TENTH CIRCUIT

**Christopher M. Wolpert**
**Clerk of Court**

_____

JAVIER GARCIA-BOTELLO,

　　Petitioner,

v.

PAMELA J. BONDI[1], United States
Attorney General,

　　Respondent.

----------------------------------

IMMIGRANT LEGAL DEFENSE;
DISABILITY RIGHTS ADVOCATES;
LAW PROFESSORS; HARVARD LAW
SCHOOL PROJECT ON DISABILITY;
NATIONAL IMMIGRANT JUSTICE
CENTER; HARVARD IMMIGRATION
AND REFUGEE CLINIC,

　　Amici Curiae.

No. 24-9507

_____

**Petition for Review of an Order from the**
**Board of Immigration Appeals**
_____

---

[1]　　Pursuant to Federal Rule of Appellate Procedure 43(c)(2), the current Attorney General, Pamela J. Bondi, is automatically substituted for Merrick B. Garland, who was the Attorney General when Mr. Garcia-Botello filed his petition for review.

Carolyn M. Welter, Wheeler Trigg O'Donnell LLP, Denver, Colorado (Gabrielle L. Lombardi, Wheeler Trigg O'Donnell LLP, Denver, Colorado, and Laura Lunn, Director of Advocacy & Litigation, Rocky Mountain Immigrant Advocacy Network, Westminster, Colorado, with her on the briefs) for Petitioner.

Duncan T. Fulton, Trial Attorney (Erica B. Miles, Assistant Director, with him on the brief), United States Department of Justice, Office of Immigration Litigation, Washington, D.C., for Respondent.

Jessica Zhang, Immigrant Legal Defense of Oakland, California, filed an amicus curiae brief on behalf of Immigrant Legal Defense, Disability Rights Advocates, and Law Professors, in support of Petitioner.

Steven H. Schulman, Akin Gump Strauss Hauer & Feld LLP, Washington, D.C., filed an amicus curiae brief on behalf of Harvard Law School Project on Disability, National Immigrant Justice Center, and Harvard Immigration and Refugee Clinic, in support of Petitioner.

_____

Before **HOLMES**, Chief Judge, **McHUGH**, and **ROSSMAN**, Circuit Judges.

_____

**HOLMES**, Chief Judge.

_____

Javier Garcia-Botello, a Mexican citizen, petitions for review of an order by the Board of Immigration Appeals ("BIA") affirming the denial by an Immigration Judge ("IJ") of his application for relief from removal under the Convention Against Torture ("CAT").[2] Exercising jurisdiction under 8 U.S.C. § 1252, we **deny** the petition for review.[3]

_____

[2] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. TREATY DOC. NO. 100-20, 1465 U.N.T.S. 113.

[3] We **grant** Mr. Garcia-Botello's motion to proceed in forma pauperis. *See* FED. R. APP. P. 24(b)(2). Furthermore, during the pendency of this appeal, this court entered a temporary stay of removal. *See* Order Granting Temporary Stay,

Mr. Garcia-Botello has remained in the United States unlawfully since 1998, when at the age of thirteen he overstayed his temporary tourist visa. He came to the attention of the Department of Homeland Security ("DHS") when, after experiencing profound behavioral changes wrought by injuries he sustained in a serious car accident, he was convicted of assault. In 2018, the DHS charged him as removable to Mexico for remaining in the United States beyond the expiration of his visa, in violation of 8 U.S.C. § 1227(a)(1)(B).[4] Before the agency, he conceded his removability, but he sought withholding of removal under the CAT. He argued that, because of the disabling injuries he suffered in the car accident, he likely would be institutionalized and tortured upon removal to Mexico. The IJ denied his application, and the BIA affirmed.

Mr. Garcia-Botello now petitions this court for review of the BIA's denial of relief.[5] His petition raises four[6] challenges: (1) the BIA erred in failing to consider

---

No. 24-9507, at 1–2 (10th Cir., filed Aug. 8, 2025). The temporary stay entered by the court is **lifted upon issuance of the mandate**.

[4]    In pertinent part, it states: "Any alien who is present in the United States in violation of this chapter or any other law of the United States[] . . . is deportable." 8 U.S.C. § 1227(a)(1)(B). Noncitizens who overstay their temporary tourist visa violate 8 U.S.C. § 1202(g).

[5]    Although the BIA affirmed the IJ's denial of CAT relief, we refer throughout to the BIA as having denied relief because we review its single-member, brief order "as the final agency determination." *Diallo v. Gonzales*, 447 F.3d 1274, 1279 (10th Cir. 2006).

[6]    Mr. Garcia-Botello's petition also raises two other challenges, but we decline to reach them.

3

He firstly argues that the BIA erred in failing to consider his risk of torture from criminal organizations. But he failed to exhaust that argument before the BIA. *See* 8 U.S.C. § 1252(d)(1) ("A court may review a final order of removal only if the alien has exhausted all administrative remedies available to the alien as of right."); *Miguel-Pena v. Garland*, 94 F.4th 1145, 1158 (10th Cir. 2024) (exercising discretion to consider § 1252(d)(1) exhaustion where, as here, government forfeited objection to failure to exhaust); *see also Bonilla-Espinoza v. Bondi*, 166 F.4th 51, 58 (10th Cir. 2026) (same). To be sure, Mr. Garcia-Botello submitted country conditions evidence before the IJ which described, as a general matter, the dangers criminal gangs posed to the public at large. However, his brief on appeal to the BIA only mentioned criminal organizations twice, in passing, in a subsection devoted to the risk of torture in penal settings. The subsection's heading stated: "The abuses in the criminal justice system and violence perpetrated by criminal organizations also rise to the level of torture and must be aggregated with the likelihood of torture in the institutional setting." R. at 129 (Resp't's Opening Br. on Appeal, filed May 15, 2020) (italicization omitted). Then, the subsection's first paragraph concluded its discussion of "the abuses found in prison settings" by stating, "Finally, when criminal organizations kidnap, torture, and kill individuals for ransom or when they perceive them to be threats, the gruesome methods they use intentionally inflict severe pain and suffering and clearly rise to the level of torture." *Id.* These two perfunctory references to criminal organizations were inadequate to administratively exhaust Mr. Garcia-Botello's argument before this court that criminal organizations pose an independent risk of torture. *See Rivera-Zurita v. I.N.S.*, 946 F.2d 118, 120 n.2 (10th Cir. 1991) ("The failure to raise an issue on appeal to the Board constitutes failure to exhaust administrative remedies with respect to that question. . . ."); *Birhanu v. Wilkinson*, 990 F.3d 1242, 1253–54 (10th Cir. 2021) (finding failure to exhaust argument before BIA where noncitizen's brief on appeal to BIA contained only two references to argument "without specifically explaining why [the argument] entitle[d] him to relief," and therefore "did not fairly present his legal theory to the BIA"), *vacated on unrelated grounds sub nom.*, *Wolie Birhanu v. Garland*, 142 S. Ct. 2862 (2022) (mem.); *see also Ramani v. Ashcroft*, 378 F.3d 554, 559 (6th Cir. 2004) (finding failure to exhaust argument before BIA where noncitizen's brief on appeal to BIA "did discuss the use of the *Country Report for Macedonia*," but "did not make his current argument[,] . . . provided no legal basis for this argument, and [] was mentioned only in the context of [a different argument]"), *abrogated on unrelated grounds by*, *Santos-Zacaria v. Garland*, 598 U.S. 411, 413–14, 416 (2023); *cf. Rangel-Fuentes v. Bondi*, 155 F.4th 1138, 1147 (10th Cir. 2025) ("While the BIA is not obligated to develop arguments for litigants, it may also not turn a blind eye to the arguments *plainly* before it." (emphasis added)).

He secondly argues that the BIA erred in failing to consider in the aggregate his risk of torture from multiple sources. Yet, as we conclude *infra*, the BIA did not

4

the entirety of his and his mother's testimony; (2) the BIA erred in treating the disjunctive governmental acquiescence requirement—that the torture be by a public official *or* with their consent or acquiescence—as conjunctive; (3) substantial evidence did not support the IJ's factual finding, which the BIA affirmed,[7] that his anticipated torturers would not possess the requisite specific intent; and (4) the BIA erred in treating the governmental acquiescence requirement as being met only by total failure to prevent or respond to torture.

We first recount the background facts giving rise to Mr. Garcia-Botello's removal proceedings. Next, we explain the procedural history leading up to his petition for review. We then assess the merits of his challenges to the BIA's denial of CAT relief. And for the reasons that follow, we reject Mr. Garcia-Botello's challenges as unavailing and **deny** his petition for review.

---

err in affirming the IJ's finding that all actors who might mistreat Mr. Garcia-Botello would lack the requisite specific intent "to inflict severe physical or mental pain or suffering." 8 C.F.R. § 1208.18(a)(5) ("An act that results in unanticipated or unintended severity of pain and suffering is not torture."). And to the extent that finding did not encompass criminal organizations, as we explained *supra*, that purported source of torture was not properly before the BIA. Thus, there was no risk of "torture" for the BIA to aggregate.

[7]     Because the BIA does not find facts in the first instance, but reviews the IJ's factual findings for clear error, *see* 8 C.F.R. § 1003.1(d)(3)(i), we refer throughout to the factual findings as having been made by the IJ and "affirmed" or "adopted" by the BIA.

**I**

In February 1998, at the age of thirteen, Mr. Garcia-Botello was admitted to the United States from Mexico on a temporary tourist visa.[8] That May, his visa expired, but he remained in the United States unlawfully. For a time, he led a relatively normal life, graduating from high school, marrying his high-school girlfriend, starting a family, and maintaining steady employment. In 2009, however, he was involved in a serious car accident.

At the age of twenty-six, Mr. Garcia-Botello suffered life-altering injuries when he was ejected from the passenger seat of a fast-moving car of which the driver had lost control. He sustained severe and permanent spinal injuries, which now require him to use a walker. And he suffered a traumatic brain injury ("TBI") that caused a "significant change to [his] personality and cognitive functioning [that was] much worse than the physical impact." R. at 365 (Psychological Evaluation – Decl. of Brieanne Kidd Kohrt, PhD, dated Jan. 9, 2020).

Mr. Garcia-Botello's post-accident behavior has been marked by agitation and aggression. As a result, he has had "an increased number of encounters with the police." *Id.* at 366. His post-accident criminal history includes a 2012 arrest for obstructing police and disturbing the peace; a 2014 arrest for damaging property and disturbing the peace; another 2014 arrest for first-degree arson; four 2015 arrests for assaulting a first responder, failure to appear, assaulting a peace officer, and violating

---

[8]    We derive these background facts from "uncontroverted parts of the record." *Ramos v. Bondi*, 155 F.4th 1154, 1159 n.3 (10th Cir. 2025).

a protection order; and two 2016 convictions for assault by drugging. Following his 2016 convictions, the DHS initiated removal proceedings against him.

## II

### A

On November 29, 2018, the DHS filed a Notice to Appear, charging Mr. Garcia-Botello as removable to Mexico for remaining in the United States beyond the expiration of the temporary tourist visa on which he was admitted, in violation of 8 U.S.C. § 1227(a)(1)(B).

### B

On January 24, 2019, Mr. Garcia-Botello appeared before an Immigration Judge for a hearing, where he admitted the factual allegations against him. The IJ ordered that Mr. Garcia-Botello be removed to Mexico. However, the BIA remanded the case to the IJ on August 2, 2019, based on concerns that Mr. Garcia-Botello was not competent to participate in the removal proceedings. On September 19, 2019, the IJ conducted a Judicial Competency Inquiry and found that Mr. Garcia-Botello was not competent to represent himself. Accordingly, the IJ appointed counsel to represent him.

On November 14, 2019, Mr. Garcia-Botello filed an application for withholding of removal under the CAT pursuant to 8 C.F.R. § 1208.17.[9] In his

---

[9] Mr. Garcia-Botello also applied for asylum and withholding of removal under 8 U.S.C. § 1231(b)(3), but he conceded his ineligibility for that relief before the agency.

supporting declaration, Mr. Garcia-Botello averred that if he were sent back to Mexico, he would "have no one there" and would be unable to "get around without a wheelchair or a walker," "hold a job," or "manage basic care for [himself]." R. at 1253 (Attach. to Form I-589, dated May 19, 2019). "I would probably end up on the streets," Mr. Garcia-Botello continued, "where my behaviors would make me a target." *Id*. He feared being "killed," "jailed," or "forced into an institution" where people are "treat[ed] . . . like animals" with "no rights and no way to fight it." *Id*. Mr. Garcia-Botello's argument was essentially that the mistreatment he would experience in Mexico satisfied the CAT's definition of torture and would therefore entitle him to protection in the United States.

In addition to his own statement, Mr. Garcia-Botello submitted as evidence in support of his application for CAT protection a declaration from his mother; a report by clinical psychologist Dr. Brieanne Kidd Kohrt; medical records; criminal records; and country-conditions evidence.

On January 10, 2020, Mr. Garcia-Botello appeared before the IJ for a hearing on his application for protection under the CAT. Mr. Garcia-Botello testified, and he also presented testimony from Dr. Kohrt and his mother.

Mr. Garcia-Botello's testimony exhibited his cognitive limitations: it was repetitive and meandering, and he struggled to answer many of the questions put to him. He did, however, answer basic questions about himself and the 2009 car accident. He testified that he has been unable to work since the accident. He remembered some details about his criminal history but could not remember other

8

crimes at all. For example, he remembered an instance of spitting on a law enforcement officer but could not remember his aggravated assault convictions.

Mr. Garcia-Botello testified that he was afraid to return to Mexico. His testimony focused on his fears about past victimization of his family members by cartels rather than his fear of disability discrimination: even when prompted as to the latter, he testified only about his cousins who were killed and raped by criminals seeking money from his family. He also testified that he has friends in Mexico but no family there who could care for him, and that he did not believe he would be able to find employment or appropriate medical care.

Dr. Kohrt's testimony concerned a report that she had prepared after evaluating Mr. Garcia-Botello the week prior. Based on her evaluation, Dr. Kohrt diagnosed Mr. Garcia-Botello with Major Neurocognitive Disorder due to TBI with behavioral disturbance and explained that his condition significantly diminished his cognitive abilities and independence. In her report, Dr. Kohrt summarized Mr. Garcia-Botello's ongoing symptoms as follows:

> He has significant executive functioning difficulties, which lead to him being impulsive, not understanding complex ideas, having difficulties with memory and concentration, and not being able to inhibit inappropriate behaviors, including his frequent use of profanity, outbursts of irritability and anger, and in the past, sexualized behavior. His emotions are very intense, and thus can become extremely agitated or angry, or extremely sad and hopeless. This is all consistent with the extent and location of his brain injury. This intense emotional lability in addition to his inability to inhibit behaviors, and his initial confusion and disorientation following the injury, appears to have led to an increase in unpredictable, and at times, aggressive behavior. While this was stabilized on medications, which included an antipsychotic and an antidepressant, his inability to

> understand the consequences of his behavior or the experience of others has significantly limited his judgement and ability to engage with others in a socially appropriate way. . . . [H]e does not possess the skills to independently inhibit this behavior.

R. at 373–74 (underlining omitted). Consistent with these symptoms, Dr. Kohrt opined that "[t]he level of disability he experiences . . . is severe." *Id*. at 374–75. Although Mr. Garcia-Botello's symptoms have, at times, stabilized with medication, she continued, "it is unlikely that his condition will improve over time." *Id*. at 375. As a result of his condition, Dr. Kohrt assessed that Mr. Garcia-Botello is "unable to live independently," "care for himself, hold down a job, maintain adult relationships, or engage fully in society," and that he needs "ongoing and significant support from his family in order to stay safe and healthy," "significant monitoring and medical attention," and "psychiatric medication to maintain emotional and behavioral stability." *Id*. Dr. Kohrt also found that Mr. Garcia-Botello's symptoms are exacerbated by substance use, including alcohol and marijuana, which he has some history of abusing.

Dr. Kohrt characterized Mr. Garcia-Botello's interactions with police as "consistent with his injury." *Id*. at 374. "Without the necessary treatment and supports," she concluded, "he is at high risk for victimization by others, and will likely have further incidents of bizarre, agitated or aggressive behavior that will likely result in further interactions with the criminal justice system." *Id*. at 377.

Pursuant to these findings, Dr. Kohrt testified that Mr. Garcia-Botello could succeed in a highly structured, predictable, controlled environment, and that his care

10

plan should include consistent monitoring from medical professionals, proper medication, abstinence from drugs and alcohol, therapy, and trained caregiving. By contrast, she testified that it would be "dangerous for him and probably for others" if he were to live alone. *Id.* at 268.

Mr. Garcia-Botello's mother, Hilda Botello Gallegos,[10] testified that before the 2009 accident, Mr. Garcia-Botello was a good son, a good student, a hard worker, and a good friend. But, she explained, "in that accident[,] that son . . . died and a new son was born." *Id*. at 304. She testified that Mr. Garcia-Botello is unable to live independently. Importantly, she testified that he often forgets to take his medication, and that this has led to as many as forty incidents in which she has had to call paramedics; many of these episodes have also involved law enforcement, and some have led to arrests.

Ms. Botello Gallegos testified that there was no one in Mexico to care for her son; her only family there was a brother who could not care for her son because he was already caring for a daughter with special needs. The rest of her family left Mexico for the United States, fleeing violence: she testified that in Mexico, her niece was kidnapped, her nephew was kidnapped and killed, and another niece was kidnapped and sexually abused. She averred that, in Mexico, there is "a lot of violence" that "mostly comes from the government," specifically "bad people in the

---

[10]    We note that Mr. Garcia-Botello's Opening Brief refers to his mother as "Ms. Gallegos Botello" rather than Ms. Botello Gallegos. We use the latter because that is the name that she uses in her declaration. *See* R. at 284 ("My name is Hilda Botello Gallegos.").

government," *id*. at 311; however, she testified that neither she nor her son had been previously harmed by a government official in Mexico. She stated that neither she nor her family would move to Mexico if Mr. Garcia-Botello were deported because of fears of violence. Indeed, Ms. Botello Gallegos testified that she has only returned to Mexico to visit family on a few occasions since obtaining her immigration status as a lawful permanent resident.

Mr. Garcia-Botello introduced as country-conditions evidence a series of reports detailing investigations into torture and other human rights abuses in Mexico. The reports were authored by organizations including the Inter-American Commission on Human Rights ("IACHR"); Amnesty International; the United Nations Special Rapporteur; the U.S. Department of State's Bureau of Democracy, Human Rights, and Labor; and Disability Rights International ("DRI"). Mr. Garcia-Botello presented these reports as evidence that police, prison guards, health-care workers, and criminal organizations engage in physical violence to obtain confessions or information, to punish and humiliate victims, to extort money, and for discriminatory purposes.

## C

After considering the evidence presented and finding Mr. Garcia-Botello's and Ms. Botello Gallegos's testimony to be credible, the IJ denied Mr. Garcia-Botello's application for protection under the CAT. The IJ held that Mr. Garcia-Botello did not satisfy his burden to establish that he "more likely than not" risked torture in Mexico by or with the acquiescence of a public official or person acting in an official

capacity. Although the IJ made a finding that Mr. Garcia-Botello's "erratic behavior" and related criminal history in the United States indicated a "potential" for similar encounters with law enforcement in Mexico, the IJ was not persuaded that Mr. Garcia-Botello would more likely than not be detained or institutionalized. R. at 207. Similarly, the IJ found that even if Mr. Garcia-Botello were to face encounters with Mexican law enforcement, he did not establish that he would more likely than not face torture, as defined by the CAT.

In particular, the IJ found that Mr. Garcia-Botello did not establish that he was likely to experience harm resulting from an actor's "*specific intent* to cause [him] severe pain or suffering" based on his disability even if he were detained or institutionalized in Mexico. *Id*. Rather, the IJ found that the evidence reflected a likelihood that any harm he experienced would be from "neglect, a lack of resources, or insufficient training or education." *Id.* at 208 (citing *Matter of J-R-G-P-*, 27 I. & N. Dec. 482, 484 (BIA 2018)). The IJ also held that Mr. Garcia-Botello did not show that any harm he might experience would be by or at the acquiescence of a Mexican official.

**D**

Mr. Garcia-Botello appealed the IJ's ruling to the BIA, and the BIA affirmed in a single-member, brief order. The BIA "acknowledge[d] the hardship that [Mr. Garcia-Botello's] removal will cause him due to the seriousness of his physical and mental health disabilities, and his lack of close contacts in Mexico." R. at 4 (Written Decision of BIA, filed Feb. 16, 2024). The BIA also acknowledged that

13

"some law enforcement agents engage in unlawful conduct in Mexico, and prison conditions can be harsh and life-threatening." *Id.* at 5. The BIA further noted Mr. Garcia-Botello's "descriptions of abuse and neglect by healthcare staff" in Mexican mental health institutions, which it described as "underfunded" and "experienc[ing] significant infrastructure and service problems." *Id.* It also recognized that efforts by the Mexican government to "address[] . . . abuse in mental health facilities . . . have been applied inconsistently and resulted in limited improvements." *Id.*

Nonetheless, the BIA affirmed the IJ's finding that—even assuming Mr. Garcia-Botello engaged in "erratic behavior" in Mexico that would expose him to imprisonment or institutionalization—he had failed to establish eligibility for CAT protection. *Id*. at 4–6. First, the BIA found that "a mentally ill person's greater risk of harm in a Mexican prison results from the inadequacy of the Mexican prison system, as opposed to a specific intent to torture the mentally ill." *Id.* at 5 (citing *Matter of J-R-G-P-*, 27 I. & N. Dec. at 485–86). Second, the BIA concluded that any "mistreatment" Mr. Garcia-Botello might experience in "a mental institution in Mexico" "would be the result of neglect, lack of resources, or insufficient training and education, as opposed to a specific intent to torture him." *Id.* Third, the BIA determined that the Mexican government's "ongoing issues" implementing its prohibition on discrimination against persons with disabilities and mixed attempts to investigate and mitigate abuse in mental health facilities were "insufficient to

14

establish that a public official more likely than not will acquiesce (including the concept of willful blindness) in torture of the respondent." *Id.*

"Overall," the BIA stated, "the Immigration Judge did not commit legal error or clear factual error in determining that the respondent did not establish that he more likely than not will be tortured by or with the acquiescence (including the concept of willful blindness) of a public official." *Id.* at 6. The BIA accordingly dismissed Mr. Garcia-Botello's appeal of the IJ's denial of CAT relief.

Mr. Garcia-Botello now petitions this court for review of the BIA's decision.

**III**

With the factual circumstances of Mr. Garcia-Botello's petition established, we now turn to the legal standards guiding our review of the BIA's decision.

We review the BIA's single-member, brief order affirming the IJ's order "as the final agency determination." *Diallo v. Gonzales*, 447 F.3d 1274, 1279 (10th Cir. 2006); *see also Htun v. Lynch*, 818 F.3d 1111, 1118 (10th Cir. 2016) ("On appeal of a BIA order, '[t]he scope of our review is governed by the form of the BIA decision.' Where, as here, a single BIA member issues a brief order affirming the IJ's decision, we review the order as the final agency determination and limit our review to the grounds relied upon by the BIA." (alteration in original) (citation omitted) (quoting *Ritonga v. Holder*, 633 F.3d 971, 974 (10th Cir. 2011))). Nonetheless, we "may consult the IJ's opinion to the extent that the BIA relied upon or incorporated it." *Karki v. Holder*, 715 F.3d 792, 800 (10th Cir. 2013) (quoting *Sarr v. Gonzales*, 474 F.3d 783, 790 (10th Cir. 2007)); *see also Htun*, 818 F.3d at 1118 ("But, 'when

15

seeking to understand the grounds provided by the BIA, we are not precluded from consulting the IJ's more complete explanation of those same grounds.'" (quoting *Uanreroro v. Gonzales*, 443 F.3d 1197, 1204 (10th Cir. 2006))).

"We review the BIA's legal determinations de novo" and the factual findings adopted by it for substantial evidence.[11] *Niang v. Gonzales*, 422 F.3d 1187, 1196 (10th Cir. 2005); *see also Nasrallah v. Barr*, 590 U.S. 573, 583–84 (2020) ("Although a noncitizen may obtain judicial review of factual challenges to CAT orders, that review is highly deferential . . . . The standard of review is the substantial-evidence standard . . . ."). Under the substantial-evidence standard, we view the factual findings adopted by the BIA as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Escobar-Hernandez v.*

---

[11]    We have jurisdiction to review Mr. Garcia-Botello's factual challenges to the BIA's decision even though he was convicted of crimes specified in 8 U.S.C. § 1252(a)(2)(C), which provision, in conjunction with § 1252(a)(2)(D), bars judicial review of purely factual challenges to final orders of removal against noncitizens who are "removable by reason of having committed a criminal offense covered in section [] [] 1227(a)(2)(A)(iii)." *See* 8 U.S.C § 1227(a)(2)(A)(iii) (covering aggravated felonies); R. at 4 (noting Mr. Garcia-Botello's concession that his crimes of conviction were aggravated felonies); *Nasrallah v. Barr*, 590 U.S. 573, 583 (2020) (characterizing § 1252(a)(2)(C) as "Congress's decision to bar judicial review of factual challenges to final orders of removal"). This is so because Mr. Garcia-Botello was found removable "by reason of" his presence in the United States beyond the expiration of the visa on which he was admitted, *not* his criminal convictions. *See* R. at 185, 1473. And his factual challenges are directed to the BIA's denial of his application for CAT relief, *not* his order of removal. *See, e.g.*, R. at 3; Pet'r's Opening Br. at 15; *see Nasrallah*, 590 U.S. at 583 ("Congress's decision to bar judicial review of factual challenges to final orders of removal does not bar judicial review of factual challenges to CAT orders."); *see also Igiebor v. Barr*, 981 F.3d 1123, 1126 (10th Cir. 2020) ("[T]he jurisdictional bar set out in 8 U.S.C. § 1252(a)(2)(C)–(D) does not apply to final orders denying CAT relief.").

16

*Barr*, 940 F.3d 1358, 1361 (10th Cir. 2019); *accord* 8 U.S.C. § 1252(b)(4)(B); *Htun*, 818 F.3d at 1119.  And we extend "deferential" review to the BIA's resolution of mixed questions of law and fact that are primarily factual, such as whether the BIA properly analyzed established facts under a statutorily provided legal standard.[12]  *See Wilkinson v. Garland*, 601 U.S. 209, 212, 225 (2004) (explaining that "[t]he application of a statutory legal standard . . . to an established set of facts is a quintessential mixed question of law and fact," and giving "deferential" review where that inquiry was "primarily factual"); *accord Martinez v. Garland*, 98 F.4th 1018, 1021 (10th Cir. 2024).

Relief from removal under the CAT is mandatory if the applicant proves that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal."  8 C.F.R. § 1208.16(c); *accord Niang*, 422 F.3d at 1194; *Uanreroro*, 443 F.3d at 1202.

---

[12]    We understand this "deferential" standard of review to necessarily be less exacting than de novo review of a purely legal question.  To date, however, we have not elaborated on what precise standard such "deferential" review entails.  *See Hermosillo-Robles v. Bondi*, No. 24-9552, 2025 WL 1576766, at *2 n.2 (10th Cir. June 4, 2025) (unpublished) ("We have not elaborated on the 'deferential standard of review' for hardship determination challenges that was first announced in *Wilkinson*." (citing *Martinez v. Garland*, 98 F.4th 1018, 1021 (10th Cir. 2024))); *cf. United States v. Ellis*, 23 F.4th 1228, 1238 n.6 (10th Cir. 2022) ("We deem the reasoning of the unpublished decisions cited herein to be persuasive and instructive.  We do not accord them controlling weight and recognize that they are not binding on us.").

For example, we have not stated whether this deferential review equates to the substantial evidence standard of review.  We decline to opine further today because the issue is not presented for our consideration and not determinative of our disposition of Mr. Garcia-Botello's petition.

17

> Torture is defined as any act by which severe pain or suffering, whether physical or mental, is *intentionally* inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted *by*, or at the instigation of, *or with the consent or acquiescence of*, a public official acting in an official capacity or other person acting in an official capacity.

8 C.F.R. § 1208.18(a)(1) (emphases added). "In order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering." *Id.* § 1208.18(a)(5).

"Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity. Such awareness requires a finding of either actual knowledge or willful blindness." *Id.* § 1208.18(a)(7); *accord Karki*, 715 F.3d at 806.

### IV

Mr. Garcia-Botello raises four challenges to the BIA's denial of CAT relief: (1) the BIA erred in failing to consider the entirety of his and his mother's testimony; (2) the BIA erred in treating the disjunctive governmental acquiescence requirement—that the torture be by a public official *or* with their consent or acquiescence—as conjunctive; (3) substantial evidence did not support the IJ's factual finding, affirmed by the BIA, that his anticipated torturers would not possess the requisite specific intent; and (4) the BIA erred in treating the governmental

18

acquiescence requirement as being met only by total failure to prevent or respond to torture. We address each challenge in turn, although we find none availing.

**A**

First, Mr. Garcia-Botello argues that the BIA erroneously disregarded his and his mother's testimony, in violation of the Due Process Clause of the Fifth Amendment and 8 U.S.C. § 1229a. This challenge is unavailing. His due process and § 1229a arguments fail because the BIA clearly referenced his and his mother's testimony. And his due process argument fails for the additional reason that he cannot show that he was prejudiced by any oversight.

Mr. Garcia-Botello contends that the BIA completely disregarded his and his mother's credible testimony, in violation of his Fifth Amendment due process rights and 8 U.S.C. § 1229a. As support, he points to the agency's findings that Ms. Botello Gallegos would continue to care for Mr. Garcia-Botello if he were sent back to Mexico, and that, even without access to medication and treatment, Mr. Garcia-Botello would not act in such a way as to attract the attention of law enforcement and be detained in a prison or mental health institution. He maintains that these factual findings are at odds with his and his mother's credible testimony.

Initially, we note that Mr. Garcia-Botello's argument appears to be a substantial-evidence challenge masquerading as a claim of procedural error. As we explain *infra*, the BIA plainly did not commit the procedural error of failing to consider relevant evidence. In light of this, it appears to us that the real concern animating Mr. Garcia-Botello's argument—which rests on the contention that specific factual

19

findings are contradicted by his and his mother's credible testimony—is that those specific factual findings were not supported by substantial evidence. *Cf. Espinosa v. Garland*, No. 23-9515, 2023 WL 8539441, at *4 (10th Cir. Dec. 11, 2023) (unpublished) (explaining that because certain evidence "was plainly and explicitly considered in the BIA's opinion," petitioner's claim of error alleging failure to consider that evidence "concern[ed] not *whether* the BIA considered the evidence, but *how* it considered the evidence").[13]  But "we 'will not make arguments for [Mr. Garcia-Botello] that [he] did not make in [his appellate] briefs.'" *Cox v. Glanz*, 800 F.3d 1231, 1256 (10th Cir. 2015) (second and third alterations in original) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1257 n.1 (10th Cir. 2001)).  We therefore evaluate his claim at face value.

Mr. Garcia-Botello challenges the BIA's alleged disregard of his and his mother's testimony as violative of due process and 8 U.S.C. § 1229a.  "[A]n allegation of wholesale failure to consider evidence implicates due process." *Alzainati v. Holder*, 568 F.3d 844, 851 (10th Cir. 2009) (quoting *Hanan v. Mukasey*, 519 F.3d 760, 764 (8th Cir. 2008)), *abrogated on unrelated grounds by*, *Wilkinson*, 601 U.S. at 217; *see also Zubia Escarcega v. Garland*, No. 22-9550, 2024 WL 3688734, at *4 (10th Cir. Aug. 7, 2024) (unpublished) (same); *Espinosa*, 2023 WL 8539441, at *2 (same).  Whether wholesale failure to consider evidence also implicates 8 U.S.C. § 1229a, however, is a question of first impression in our circuit.

---

[13]    We rely on unpublished cases for their persuasive value and do not treat them as binding precedent.  *See United States v. Engles*, 779 F.3d 1161, 1162 n.1 (10th Cir. 2015).

Section 1229a requires an IJ to "decide whether an alien is removable from the United States . . . based . . . on the evidence produced at the hearing," including witness testimony. 8 U.S.C. § 1229a(c)(1)(A). It directs IJs to "determine whether or not the testimony is credible" and "weigh the credible testimony along with other evidence of record." *Id.* § 1229a(c)(4)(B). At least one of our sister circuits has determined that these directives create a statutory requirement that immigration factfinders not arbitrarily ignore unrebutted, legally significant evidence. *See Cortes v. Garland*, 105 F.4th 124, 135 (4th Cir. 2024). But Mr. Garcia-Botello does not identify any case from our court in which we have articulated this standard as a statutory requirement that emerges from 8 U.S.C. § 1229a.

In any event, we need not decide that question here. This is so because, even assuming *arguendo* that failure to consider evidence violates § 1229a in addition to due process, Mr. Garcia-Botello's challenge fails because the BIA plainly did not fail to consider the testimony of Mr. Garcia-Botello and his mother.[14] Our decision in *Alzainati*, 568 F.3d 844, is instructive. In *Alzainati*, the petitioner argued that the BIA had erred in failing wholesale to consider certain evidence. *Id.* at 851. We disagreed, deducing from the language of the BIA's opinion that it had considered the evidence. *See id.* The BIA had "noted 'the majority of the documentation' was 'new and previously unavailable.'"

---

[14]    We also need not decide that question because the parties do not appear to contest it. *See* Pet'r's Opening Br. at 24–32; Resp't's Resp. Br. at 46–49; *United States v. Rocha*, 145 F.4th 1247, 1267 (10th Cir. 2025) (assuming without deciding and applying parties' mutual conception of governing law where legal question matter of first impression).

21

*Id.* (quoting Admin. R. at 2). And the administrative record had reflected that the vast majority of the "new" documentation consisted of the evidence that the petitioner contended had not been considered by the BIA. *Id.* We therefore deduced that the BIA had considered the evidence. *See id.* ("Because the new evidence consisted only of two exhibits—approximately twenty-seven pages of school records and the psychologist's three-page evaluation—the BIA's reference to 'the majority of the documentation' allays any constitutional concern we might have that the BIA wholly failed to consider the school records.").

Here, the BIA's consideration of the testimony of Mr. Garcia-Botello and his mother can be deduced much more readily. As Mr. Garcia-Botello concedes, the IJ explicitly discussed and made positive credibility determinations about both his and his mother's testimony. For example, the IJ clearly noted that "Respondent's mother testified that since Respondent's 2009 accident, she has cared for him and reminded Respondent to take his medication. . . . She expressed her commitment to caring for her son if he remains in the United States." R. at 207. And the IJ explicitly "note[d] that Respondent's and his mother's testimony indicate that they fear Respondent will be harmed upon return to Mexico." *Id.* at 205. Moreover, those determinations were incorporated into the BIA's opinion. *See, e.g.*, *id.* at 4 (discussing how "the Immigration Judge applied *Matter of J-R-R-A-*[, 26 I. & N. Dec. 609 (BIA 2015)] . . . in finding the respondent credible"); *id.* at 5 ("[W]e will not disturb the Immigration Judge's finding that, even assuming the respondent will engage in erratic behavior that attracts the attention of law enforcement, he has not shown that he more likely than not would be

tortured in Mexico."). Thus, we are not persuaded that the BIA disregarded the testimony of Mr. Garcia-Botello and his mother. *Cf. Espinosa*, 2023 WL 8539441, at *4 (rejecting claim of error alleging that BIA failed to consider evidence of hardship to petitioner's third child where "the new evidence in this case—Petitioner's third qualifying child—was plainly and explicitly considered in the BIA's opinion").

To the extent it arises under Fifth Amendment due process, Mr. Garcia-Botello's claim of error alleging that the BIA failed to consider his and his mother's testimony also fails for lack of prejudice. *See Alzainati*, 568 F.3d at 851 ("To prevail on a due process claim, an alien must establish not only error, but prejudice."); *see also, e.g.*, *Garcia-Marrufo v. Ashcroft*, 376 F.3d 1061, 1064 (10th Cir. 2004) (rejecting due process challenge because petitioner could not "demonstrate any prejudice from the alleged due process violation"). Specifically, even if the BIA *had* ignored Mr. Garcia-Botello's and his mother's testimony, and even if that testimony conclusively showed that Ms. Botello Gallegos would not care for Mr. Garcia-Botello if he were deported to Mexico—leading Mr. Garcia-Botello to act out in such a way as to attract the attention of law enforcement, thus precipitating his incarceration or institutionalization—the BIA's denial of CAT relief remains proper because any mistreatment Mr. Garcia-Botello might suffer would *not* be the result of his putative tormentors' specific intent to torture.

The BIA upheld the IJ's determination that any mistreatment Mr. Garcia-Botello might experience in Mexico would not be the result of specific intent by the perpetrators to torture him—a determination we also uphold, as explained *infra*—and, consequently, it would not qualify as torture under the CAT. Accordingly, the BIA held that

23

Mr. Garcia-Botello did not qualify for CAT relief "*even assuming [he would] engage in erratic behavior that attracts the attention of law enforcement.*"  R. at 5 (emphasis added).  This statement demonstrates that the specific-intent issue is dispositive for Mr. Garcia-Botello's CAT claim and that the particular factual conclusions Mr. Garcia-Botello challenges on due process grounds would not alter the ultimate disposition of his case even if they came out the other way.

In sum, because the BIA would still have denied him CAT relief on this proper specific-intent basis, any error that Mr. Garcia-Botello sees (which, we emphasize, we do not see) did not alter the outcome of his proceeding.  Because "the result would have been no different" if the BIA *had* failed to consider the contested evidence, Mr. Garcia-Botello fails to establish prejudice.  *Garcia-Marrufo*, 376 F.3d at 1064.  In other words, because of the specific-intent issue in Mr. Garcia-Botello's case, he was not prejudiced by the BIA's factual conclusions that he challenges.

The BIA did not violate Mr. Garcia-Botello's due process or statutory rights by failing to consider his and his mother's testimony, and, even if it had, such an error would not have prejudiced Mr. Garcia-Botello.

**B**

Second, Mr. Garcia-Botello argues that the BIA applied the incorrect legal test to determine whether Mexican government officials would be involved in any torture by reading the CAT to require that the government as a whole acquiesce to torture.  We review this legal argument de novo and hold that the BIA applied the correct legal standard for acquiescence.

Mr. Garcia-Botello contends that the BIA's approach to the acquiescence standard conflated the two ways of showing government acquiescence: through the consent of any public officials to torture by private individuals, or through intentional acts of torture by any public officials. Mr. Garcia-Botello believes this erroneous approach improperly doomed his government acquiescence theory because it caused the BIA to ignore his showing of the specific intent of public officials: "evidence that police and prison guards torture to obtain confessions or information [and] that health-care workers, lacking any therapeutic justification, torture to punish misbehavior or discriminate against people with disabilities." Pet'r's Opening Br. at 36.

Mr. Garcia-Botello also contends that the BIA's error caused it to ignore his showing of acquiescence by public officials to torture by private actors: evidence that private health-care workers torture to punish misbehavior and "evidence . . . that members of criminal organizations torture to extort money, threaten, or intimidate" while "government officials knowingly bring persons with disabilities to unregulated private mental health facilities that carry out grave acts of torture, knowingly leave them there, and despite significant evidence of these acts of torture, fail to ban these unregulated facilities" and while "public officials coordinate and even collude with criminal organizations to inflict torture," creating a "'critically high' level of impunity for torturers in Mexico." *Id.* at 36–37.

Mr. Garcia-Botello is, of course, correct that the test for government acquiescence is disjunctive. "By requiring that torture be '[1] by or at the instigation *or* [2] with the consent or acquiescence of a public official,' CAT protection requires a connection

25

between torture and the government in one of two ways, but not both."
*Arostegui-Maldonado v. Garland*, 75 F.4th 1132, 1145 (10th Cir. 2023) (alterations in original) (emphasis added) (quoting *DeCarvalho v. Garland*, 18 F.4th 66, 72 (1st Cir. 2021)), *abrogated in part on unrelated grounds by*, *Riley v. Bondi*, 606 U.S. 259, 263 (2025). "First, the CAT applies to pain or suffering inflicted by a 'public official acting in an official capacity or other person acting in an official capacity.'" *Id.* (quoting 8 C.F.R. § 1208.18(a)(1)). "[P]ublic officials or other persons act 'in an official capacity' when they act 'under color of law.'" *Id.* (alteration in original) (quoting *Matter of O-F-A-S-*, 28 I. & N. Dec. 35, 39 (U.S. Att'y Gen. 2020)). "An act is '"under the color of law" when the actor misuses power possessed by virtue of law and made possible only because the actor was clothed with the authority of law.'" *Id.* (quoting *Matter of O-F-A-S-*, 28 I. & N. Dec. at 39). "Second, if someone who is not a public official or a person acting in an official capacity inflicted the pain or suffering, the CAT applicant must show that public officials 'acquiesce[d]' to the acts constituting torture." *Id.* (alteration in original). "This standard does not require actual knowledge, or willful acceptance by the government . . . . Rather, willful blindness suffices to prove acquiescence." *Id.* (quoting *Karki*, 715 F.3d at 806).

However, we are unpersuaded that the BIA failed to recognize and apply the disjunctive standard here. The BIA correctly cited the proper disjunctive legal standard. *See* R. at 6 ("[T]he respondent did not establish that he more likely than not will be tortured *by or with the acquiescence (including the concept of willful blindness) of* a public official." (emphasis added) (first citing 8 C.F.R. § 1208.17(a); then citing 8 C.F.R.

26

§ 1208.18(a); and then citing *Karki*, 715 F.3d at 806)); *see also Berdiev v. Garland*, 13 F.4th 1125, 1132 (10th Cir. 2021) (concluding that BIA applied correct legal standard where it cited to precedent containing correct standard). And the BIA clearly contemplated both types of government conduct—that is, affirmative torturous conduct by public officials directly, and acceptance by public officials of torturous conduct by private actors—as distinct theories. The BIA discussed treatment by "law enforcement agents" and officials operating the "Mexican prison system" as candidates under the former theory, and it also discussed treatment in "mental health facilities" that "the government" was "investigating and addressing" as a candidate under the latter theory. R. at 5. Nothing about the BIA's opinion leads us to conclude that it mistakenly collapsed the disjunctive standard into a single, conjunctive standard.

To the extent Mr. Garcia-Botello's animating concern is that the BIA improperly considered only evidence of official action on behalf of the entire Mexican government as a whole rather than the actions of specific public officials, we are also unpersuaded. The BIA explicitly discussed evidence concerning treatment by "some law enforcement agents" and "healthcare staff" at an individual level. R. at 5. And we reiterate that the BIA was "not required to 'write an exegesis on every contention'" so long as it "announce[d] its decision in terms sufficient to enable [us] to perceive that it ha[d] heard and thought and not merely reacted." *Maatougui v. Holder*, 738 F.3d 1230, 1242–43 (10th Cir. 2013) (quoting *Becerra-Jimenez v. INS*, 829 F.2d 996, 1000 (10th Cir. 1987)). We are convinced the BIA did so here; its decision demonstrates that it considered Mr. Garcia-Botello's various theories of torture from a variety of private and public

27

officials. It applied the correct disjunctive standard for government acquiescence and did not commit legal error.

## C

Mr. Garcia-Botello's next argument is that the BIA made three errors when it affirmed the IJ's factual finding that all actors who might mistreat Mr. Garcia-Botello would lack the requisite specific intent to torture him. In this section, we examine each of the three errors that Mr. Garcia-Botello alleges in the BIA's evaluation in turn, and we ultimately conclude that each allegation is meritless.

## 1

First, Mr. Garcia-Botello argues that the BIA erred in its specific-intent analysis by failing to consider "evidence that anticipated torturers act for one of the proscribed purposes in 8 C.F.R. § 1208.18[15], even though acting with such purposes is evidence of specific intent." Pet'r's Opening Br. at 38. In other words, Mr. Garcia-Botello's apparent contention is that evidence the harms enumerated in § 1208.18 (e.g., "severe pain or suffering") were inflicted by an actor for one of § 1208.18's condemned purposes establishes, without more, that the actor acted with the requisite specific intent. As support, he cites to the Ninth Circuit's decision in *Guerra v. Barr*, 974 F.3d 909 (9th Cir.

---

[15]    8 C.F.R. § 1208.18(a)(1) enumerates as proscribed purposes "obtaining . . . a confession, punishing . . . for an act . . . committed or [] suspected of having [been] committed, intimidating or coercing[,] . . . or for any reason based on discrimination of any kind."

2020), and the Second Circuit's decision in *Pierre v. Gonzales*, 502 F.3d 109 (2d Cir. 2007).[16]

We are not persuaded. Our circuit has never held that acting with one of the proscribed purposes listed in 8 C.F.R. § 1208.18, without more, is sufficient to establish specific intent to torture—at least Mr. Garcia-Botello has not identified any such case for us, and we have not found any. Furthermore, neither *Guerra* nor *Pierre* stands for the proposition that the BIA must expressly treat this evidence as determinative on the requisite specific-intent question.

In *Guerra*, the petitioner, like Mr. Garcia-Botello, sought CAT protection on the ground that upon removal to Mexico he likely would be tortured in a prison or a psychiatric institution based on his mental disability. 974 F.3d at 911. The IJ found that Mexican officials in mental health institutions would have a specific intent to torture him because they would "intentionally inflict harm on [him] for a proscribed purpose." *Id.* at 913. The BIA rejected the IJ's specific-intent finding as clearly erroneous—instead "accord[ing] more weight to country reports in the record that the extreme measures were taken as a misguided effort to prevent patients from harming themselves or others," and "attributing the persistence of these problems to 'the difficulties inherent in addressing a

---

[16]    Mr. Garcia-Botello further clarifies the import of his argument by directing us to a University of Virginia law journal article. Pet'r's Opening Br. at 39. There, as Mr. Garcia-Botello highlights, the commentators offer the following observation: "The specific intent requirement for torture is met by evidence that pain or suffering will be knowingly inflicted on an individual for a proscribed purpose." Oona A. Hathaway, Aileen Nowlan & Julia Spiegel, *Tortured Reasoning: The Intent to Torture Under International and Domestic Law*, 52 VA. J. INT'L L. 791, 820 (2012).

complex public policy issue with insufficient material resources.'" *Id.* at 913–14

(quoting record). On the petitioner's petition for review, the Ninth Circuit concluded that

the BIA erred in failing to review the IJ's specific-intent finding for clear error. *Id.* at

914.

Although *Guerra*'s upshot is that the BIA erred in weighing, for purposes of the

CAT specific-intent determination, the evidence of unsophistication and lack of resources

more heavily than the evidence of actors inflicting harm for a proscribed purpose, it does

not further Mr. Garcia-Botello's cause. The Ninth Circuit's point was *not* that evidence

of unsophistication and resource limitations cannot outweigh evidence that actors inflict

harm for a purpose proscribed by 8 C.F.R. § 1208.18 when evaluating specific intent. Its

point, rather, was that once the IJ weighed the evidence as such, the BIA lacked the

authority on clear error review to upset that determination merely because it would have

weighed those factors differently. It reasoned:

> [T]he clear error standard does not allow the BIA to reweigh the
> evidence when the IJ's account of the evidence is plausible. *See*
> *Rodriguez*[ *v. Holder*], 683 F.3d [1164,] 1171 [(9th Cir. 2012)]
> (discussing *Anderson*[ *v. City of Bessemer City, N.C.*], 470 U.S. [564,]
> 573–74[ (1985)]). The IJ acknowledged and *rejected* the alternative
> explanation that mental health officials' actions can be explained by
> gross negligence and a misunderstanding of the nature of psychiatric
> illness. On appeal, the BIA stated that it "accord[ed] more weight to
> country reports in the record that [the IJ] did not find persuasive." But
> the BIA cannot reverse the IJ's factual finding "even though [it is]
> convinced that had it been sitting as the trier of fact, it would have
> weighed the evidence differently." *Anderson*, 470 U.S. at 574[].

*Id.* at 914. And it distinguished its earlier decision in *Villegas v. Mukasey*, 523 F.3d 984

(9th Cir. 2008), which denied a petition for review of a BIA order affirming an IJ's

30

finding of no specific intent based on evidence of unsophistication and resource limitations, on the ground that the IJ there "*denied* CAT relief." *Id.* at 914–15. In other words, the BIA did not err in *Villegas* because the IJ's determination that evidence of unsophistication and resource limitations weighed more heavily was not clearly erroneous.

Understood in this light, *Guerra* does not further Mr. Garcia-Botello's cause. Here—like in *Villegas*, and unlike in *Guerra*—the IJ weighed in its specific-intent calculus the evidence of Mexico's resource limitations more heavily than any purported evidence that Mr. Garcia-Botello's anticipated torturers acted for a proscribed purpose. It could permissibly do so under clear error review if there was adequate record support.

*Pierre*, 502 F.3d 109, is also unhelpful to Mr. Garcia-Botello. True, the Second Circuit noted that "[e]vidence showing an illicit purpose may easily overlap with evidence showing a specific intent to inflict severe pain or suffering." *Pierre*, 502 F.3d at 119 n.8. But the Second Circuit proceeded to clarify that the foregoing observation did not establish a categorical rule: although the court noted that "imprisonment," the action at issue in that case, "is by its nature designed to punish" (one of the purposes listed in the regulation), the court decided that imprisonment itself does not satisfy the definition of torture. *Id.* The Second Circuit ultimately denied the petition because it held that there was no error in the BIA's assessment that harsh penal conditions did not amount to torture. *See id.* at 111. Accordingly, Mr. Garcia-Botello's interpretation of *Pierre*—as supporting his view that acting with one of the proscribed purposes listed in 8 C.F.R. § 1208.18, without more, is sufficient to establish specific intent to torture—is misguided.

In sum, Mr. Garcia-Botello fails to show that the BIA's specific-intent analysis was erroneous because it failed to consider and accord appropriate weight to evidence that his anticipated torturers acted with one of the purposes that 8 C.F.R. § 1208.18 condemns.

## 2

Mr. Garcia-Botello also argues that the BIA ignored circumstantial evidence of specific intent based on "the nature and severity of [the] anticipated acts." Pet'r's Opening Br. at 43. As support, he cites several cases from other circuits that he believes may be read to suggest that specific acts, undertaken intentionally, are so torturous in nature that the performance of them alone evinces a specific intent to torture. He identifies several acts—"beatings[,] . . . prolonged restraints, isolation, and non-consensual psychosurgeries"—that he believes he will be subjected to and that he believes would fall into this category. *Id.* at 48.

We begin our analysis by noting that Mr. Garcia-Botello has again not identified any case from our court or from the Supreme Court that establishes a precedent for his preferred approach—*viz.*, finding a specific intent to torture based solely on the character of the acts themselves. As a consequence, we see no reason to adopt such a standard unless we are persuaded by the non-binding cases of our sister circuits on which Mr. Garcia-Botello seeks to rely. We summarize the most salient of those cases here.

Mr. Garcia-Botello's best case is *Kang v. Attorney General of the United States*, 611 F.3d 157 (3d Cir. 2010). There, the Third Circuit reversed the BIA's denial of CAT relief and granted the petitioner withholding of removal pursuant to the CAT because

32

"the evidence . . . compel[led] the conclusion that it [wa]s more likely than not that Kang w[ould] be tortured if returned to China." *Id.* at 167–68. The petitioner, a Chinese citizen, was a member of a group that had been targeted with an arrest warrant by Chinese authorities for providing food and shelter to North Korean refugees. *See id.* at 160. The Third Circuit determined that the petitioner had shown it was more likely than not that he would be tortured, and it dismissed the government's contentions that the mistreatment the petitioner had shown he would likely be subjected to was "merely evidence of deplorable prison conditions" or "substandard prison conditions." *Id.* at 167. In so holding, the court noted that "[t]he acts themselves compel the conclusion that they were intended to inflict pain." *Id.*

Even if *Kang* could be understood to support Mr. Garcia-Botello's proposition that certain acts themselves evince a specific intent to cause pain, we are not persuaded to apply it to this case, because the acts of the Chinese officials are different in kind and degree from the acts alleged here. In *Kang*, the potential treatment included being "suffocated [using a plastic bag], deprived of sleep, . . . and/or forced to stand for long periods of time." *Id.* at 166. We understand the Third Circuit's inclination to find a torturous purpose from these acts because we do not see any justification for these practices that can be chalked up to unsophistication or a lack of resources. On the other hand, the country-conditions evidence here shows that, at the extreme, Mr. Garcia-Botello may face the use of prolonged restraints, psychosurgery, and corporal punishment. *See* R. at 558 (Report of the Special Rapporteur, dated Dec. 29, 2014); *id.* at 628–29 (Abandoned & Disappeared: Mexico's Segregation and Abuse of Children and

33

Adults with Disabilities, dated Nov. 30, 2010).  Although certainly shocking to our

sensibilities in the United States about how to best and most humanely treat persons with

disabilities, these practices do not by their very nature "*compel* the conclusion that they

were intended to inflict pain."  *Kang*, 611 F.3d at 167 (emphasis added).

To the contrary, the BIA could reasonably conclude that they reflect a lack of

sophistication and resources.  *See, e.g.*, R. at 558 ("Detention centres do not have the

facilities, resources or trained staff to provide decent treatment and the necessary medical

and psychological care to persons with disabilities . . . ."); *id.* at 628–29 ("[A]uthorities

reported that in the absence of other forms of treatment for behavior problems or

aggression, they usually use psychotropic medications.  But when this does not work,

people may be subject to psychosurgery."); *id.* at 673 (Abuses Found at Mexican

Institutions for Disabled, dated Nov. 30, 2010) ("[Lobotomies] fell into disrepute

internationally in the 1950s because it frequently caused irreversible brain damage.  But it

remains legal in Mexico."); *see also, e.g.*, *Fiddler v. Bondi*, 147 F.4th 757, 759–60 (7th

Cir. 2025) ("Mr. Fiddler did not show that police practices embodied the requisite intent

or purpose of torture.  Rather, 'instances of violence against mentally ill individuals

appear to be the unfortunate result of a combination of stigma, lack of training, and lack

of resources, which does not amount to torture.'"  (quoting A.R. 153)); *Andrade v.

Garland*, 94 F.4th 904, 915 (9th Cir. 2024) (concluding that substantial evidence

supported agency's determination that "the poor conditions in Mexico's mental health

facilities are not created with the requisite specific intent" where record supported "a

plausible inference that budgetary constraints, not an intent to torture those with psychiatric disabilities, are to blame").

Mr. Garcia-Botello also cites *Ridore v. Holder*, 696 F.3d 907 (9th Cir. 2012) in support of his argument. In *Ridore*, the petitioner sought review of a BIA decision vacating an IJ's finding that the petitioner was entitled to CAT protection. *See id.* at 909. The Ninth Circuit agreed with the petitioner and granted review, finding that the BIA had erred in reviewing the IJ's decision. *See id.* We understand why Mr. Garcia-Botello believes *Ridore* helps his argument. The petitioner's basis for CAT protection was that he would be "put into prison for a prolonged period of time under horrific conditions that his expert testified and the IJ found would be almost 'equivalent to a death warrant,'" and the IJ agreed that those conditions amounted to torture because various factors suggested that the conditions were intentionally created by the Haitian government. *Id.* at 911.

However, a careful reading of *Ridore* materially distinguishes it from this case. The *Ridore* court granted the petition not because it agreed with the IJ's assessment that the conditions alleged amounted to torture, but rather because, as in *Guerra*, 974 F.3d 909, the BIA applied the incorrect standard of review to the IJ's factual findings, assessing them de novo based on the country-conditions evidence rather than reviewing them for clear error. *See* 696 F.3d at 919. Indeed, the Ninth Circuit was careful to clarify that it declined to "decide whether the IJ's assessment of the evidence or his factual findings and conclusions therefrom were correct." *Id.* at 913 n.1. Therefore, *Ridore* does not represent another circuit's endorsement of a relaxed intent standard, so we will not adopt such a standard based on its reasoning.

35

Another case Mr. Garcia-Botello relies on is *Zubeda v. Ashcroft*, 333 F.3d 463 (3d Cir. 2003). In *Zubeda*, the Third Circuit granted a petition for review of a BIA decision vacating an IJ's grant of CAT relief. *See id.* at 465. The primary reason for the court's remand was to obtain greater clarity on several antecedent factual findings, such as whether the petitioner would be detained if she were removed to the Democratic Republic of the Congo. *See id.* However, the court also "determine[d] whether the record *could*, as a matter of law, support a claim for relief under [the CAT]." *Id.* at 465 n.1 (emphasis added). As part of its assessment of the legal framework, the court stated, "[a]lthough the [CAT] regulations require that severe pain or suffering be 'intentionally inflicted,' [8 C.F.R. § 1208.18(a)], we do not interpret this as a 'specific intent' requirement." *Id.* at 473.

However, *Zubeda* was abrogated by the Third Circuit in *Auguste v. Ridge*, 395 F.3d 123 (3d Cir. 2005). In *Auguste*, the Third Circuit affirmed the district court's denial of habeas relief to an immigrant seeking CAT protection from removal to Haiti. *See id.* at 128. The basis for the appellant's CAT claim was that he would be "detained by Haitian authorities for an indeterminate amount of time in harsh and intolerable prison conditions" qualifying as torture if he were removed. *Id.* at 129. His claim therefore presented a similar theory to Mr. Garcia-Botello's and teed up the specific-intent question for the court. The Third Circuit took the opportunity to reevaluate the intent requirement for CAT relief. *See id.* at 139–48. First, in an about-face from *Zubeda*'s statement (which it dismissed as dicta), the court confirmed "there is no doubt that the applicable standard to be applied for CAT claims in the domestic context is the specific intent

36

standard." *Id.* at 143–44. Further interpreting the meaning of the specific-intent

requirement, the court stated:

> Thus, in the context of the Convention, for an act to constitute torture, there must be a showing that the actor had the intent to commit the act as well as the intent to achieve the consequences of the act, namely the infliction of the severe pain and suffering. In contrast, if the actor intended the act but did not intend the consequences of the act, *i.e.*, the infliction of the severe pain and suffering, although such pain and suffering may have been a foreseeable consequence, the specific intent standard would not be satisfied.

*Id.* at 145–46.

Applying this standard, the *Auguste* court evaluated the "circumstances" that the

appellant believed qualified as acts of torture and found that none of them were torture

because the responsible parties lacked the specific intent. *See id.* at 151–54. The court

determined that "harsh and brutal prison conditions," which it acknowledged were

"objectively deplorable," caused prisoners to "experienc[e] pain and suffering on a daily

basis," and were "among the worst [the court] ha[d] ever addressed," nevertheless did not

give rise to CAT protection because "the pain and suffering that the prisoners experience

in Haiti [could] not be said to be inflicted with a specific intent by the Haitian

government." *Id.* at 153–54. The court further explained:

> As the BIA found in *Matter of J-E-*[, 23 I. & N. Dec. 291 (BIA 2002)], the prison conditions, which are the cause of the pain and suffering of the detainees, result from Haiti's economic and social ills, not from any intent to inflict severe pain and suffering on detainees by, for instance, creating or maintaining the deplorable prison conditions. The mere fact that the Haitian authorities have knowledge that severe pain and suffering may result by placing detainees in these conditions does not support a finding that the Haitian authorities intend to inflict severe pain and suffering. The difference goes to the heart of the distinction between general and specific intent.

*Id.*

The court left the door open to future claims based on "brutal and deplorable prison conditions," explaining that it was "not adopting a per se rule" that such conditions "can never constitute torture." *Id.* at 154. "To the contrary," the court explained, "if there is evidence that authorities are placing an individual in such conditions with the intent to inflict severe pain and suffering on that individual, such an act may rise to the level of torture." *Id.*

*Auguste* provides a few takeaways, none of them helpful to Mr. Garcia-Botello. First, *Auguste* clearly abrogates *Zubeda* and renders that case useless as a persuasive articulation of the CAT intent requirement. Second, *Auguste* unambiguously holds that the CAT intent element requires that perpetrators act with the specific intent to inflict pain and suffering. Mere knowledge that pain and suffering will result does not qualify an act as torture. Third, and perhaps most importantly, the case undermines the proposition for which Mr. Garcia-Botello cites *Zubeda*: that the nature of certain acts are, alone, sufficient to establish specific intent. Fourth and finally, *Auguste* provides an example of the fact pattern in Mr. Garcia-Botello's case and exemplifies precisely why he cannot prevail. When someone seeking CAT protection can only point to harsh treatment, but cannot show that such treatment is the result of anything other than a country's "economic and social ills," that person fails to show a specific intent to torture and cannot obtain CAT relief. *Auguste*, 395 F.3d at 153.

Finally, Mr. Garcia-Botello relies on *Oxygene v. Lynch*, 813 F.3d 541 (4th Cir. 2016), *abrogated in part on unrelated grounds by*, *Nasrallah*, 590 U.S. at 576, but his

38

reliance is seriously misplaced. In *Oxygene*, the Fourth Circuit opined on the CAT intent requirement. *See id.* at 550. Notably, it adopted the same standard as the Third Circuit in *Auguste*, which "requires a CAT claimant to demonstrate that the state actor who mistreats him desires to cause his severe pain or suffering." *Id.* at 548. The court distinguished the applicable "specific intent" standard, which "'corresponds loosely' with 'purpose,'" from a "general intent" standard, which "'corresponds loosely' with 'knowledge.'" *Id.* at 549 (quoting *United States v. Bailey*, 444 U.S. 394, 405 (1980)). "Of course," the court noted, "the factfinder in a criminal trial may infer an actor's desire to bring about a consequence from facts illustrating that he knew precisely what would result from his actions. . . . But it is the prerogative of the factfinder to make the inferential leap from knowledge to desire." *Id.* The *Oxygene* court's statement does not support Mr. Garcia-Botello's position that it was error for the IJ *not* to find specific intent based purely on the conditions in Mexican prisons and mental health facilities. To the contrary, *Oxygene* suggests that (1) additional facts should aid the intent inquiry, which (2) is always a case-specific determination for the factfinder (the IJ), and (3) most importantly, ignoring the reasons for the perpetrator's actions erases the specific-intent inquiry.

In sum, we are not persuaded that the IJ erred by declining to infer specific intent to torture from the nature of the conditions to which Mr. Garcia-Botello alleges he will be subject upon his return to Mexico.

**3**

Mr. Garcia-Botello's final specific-intent argument is essentially a more fleshed-out version of a claim we perceived him to be making in IV.B, which is that the BIA supposedly focused only on system-wide, official acts of the Mexican government rather than considering the specific intent of individual public officials.

Mr. Garcia-Botello is correct that an individual qualifies for CAT protection if they can show they will more likely than not face torture from any "public official acting in an official capacity or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1); *accord Arostegui-Maldonado*, 75 F.4th at 1145. "[P]ublic officials or other persons act 'in an official capacity' when they act 'under color of law.'" *Arostegui-Maldonado*, 75 F.4th at 1145 (alteration in original) (quoting *Matter of O-F-A-S-*, 28 I. & N. Dec. at 39). "An act is '"under the color of law" when the actor misuses power possessed by virtue of law and made possible only because the actor was clothed with the authority of law.'" *Id.* (quoting *Matter of O-F-A-S-*, 28 I. & N. Dec. at 39). Therefore, actions by individual public officials can qualify as torture under the CAT. The government as a whole does not need to undertake or direct torture as official policy so long as the petitioner can show a public official who engages in torture is acting under color of law.

While Mr. Garcia-Botello gets the law right, we are unpersuaded by his criticism of the disposition of his case. The BIA clearly indicated that it considered evidence of abuse by individuals. The BIA noted, for example, the IJ's determination that "*some law enforcement agents* engage in unlawful conduct." R. at 5 (emphasis added). And it

evaluated and upheld the IJ's refusal "to infer specific intent from descriptions of abuse and neglect by *healthcare staff*." *Id.* (emphasis added). The BIA naturally discussed, as the IJ did, Mexican law regarding the treatment of individuals with disabilities as well as government-wide interventions to address mistreatment. But the BIA did not focus on these system-wide components at the expense of torture by individuals. The BIA appropriately assessed the intent of all the different groups of individuals from whom Mr. Garcia-Botello professed to face a risk of torture.

**4**

Contrary to Mr. Garcia-Botello's three arguments, the IJ's factual findings on specific intent are supported by substantial evidence. The first specific-intent finding the BIA adopted was "that a mentally ill person's greater risk of harm in a Mexican prison results from the inadequacy of the Mexican prison system, as opposed to a specific intent to torture the mentally ill." R. at 5. The BIA likewise endorsed the IJ's second specific-intent finding, that "mistreatment" in "mental institution[s] in Mexico" "would be the result of neglect, lack of resources, or insufficient training and education, as opposed to a specific intent to torture [Mr. Garcia-Botello] within the meaning of the regulations." *Id.*

The BIA's affirmations of the IJ's specific-intent findings are supported by the evidence. As the IJ noted, Mr. Garcia-Botello himself provided evidence showing that conditions in detention facilities in Mexico result from "overcrowding" as well as the "poor condition" of "infrastructure" at most of the detention facilities. *Id.* at 207–08 (citing *id.* at 556). Regarding the treatment of individuals with disabilities in detention

41

facilities, the evidence reveals that Mexican "[d]etention centres do not have the *facilities, resources or trained staff* to provide decent treatment and the necessary medical and psychological care to persons with disabilities." *Id.* at 558 (emphasis added). The evidence also shows that poor treatment in mental health institutions results from "inadequate supervision" in those settings. *Id.* at 208 (citing *id.* at 493 (U.S. Dep't of State, Country Reports on Human Rights Practices for 2018)). And the evidence reveals that "[t]he primary reason for institutionalization" of individuals with disabilities in general "is Mexico's lack of community-based services to provide the support necessary for individuals with mental disabilities to live in the community." *Id.* at 626. In sum, substantial evidence supports the IJ's findings that resource problems—not the specific intent to cause pain and suffering—are the animating cause of the conditions Mr. Garcia-Botello fears.

The ultimate resolution of Mr. Garcia-Botello's claim follows a pattern in which the BIA has upheld under clear error review an IJ's finding that poor treatment in prison and healthcare settings, including Mexico's, results from insufficient resources rather than a specific intent to torture, and the courts have held such decisions to be supported by substantial evidence. In *Matter of J-R-G-P-*, the BIA dismissed a respondent's appeal of an IJ's order denying him CAT protection. *See* 27 I. & N. Dec. at 482. The respondent's theory, like Mr. Garcia-Botello's, was that if he were removed to Mexico, "given his mental health issues, he will be arrested and either imprisoned or committed to a mental health facility in Mexico, where law enforcement officials or mental health workers will subject him to harm rising to the level of torture." *Id.* at 483. The IJ found

42

that even if the respondent were imprisoned or committed, "there was insufficient evidence to show that Mexican authorities would have the specific intent to harm him in a penal or psychiatric institution." *Id.* The BIA determined that this finding was not clearly erroneous in light of the evidence in the record. *Id.* at 486.

The BIA agreed with the IJ in *Matter of J-R-G-P-* that "any extreme pain and suffering the respondent may experience as an arrestee, in prison, or in a mental health facility in Mexico will more likely than not result from a lack of resources, training, education, or negligence—rather than acts specifically intended to inflict severe pain or suffering upon the respondent." *Id.* The BIA acknowledged that "the record indicates that detainees and prisoners with mental health issues often do not receive necessary medications and medical attention," but it determined that "such appalling conditions result from a lack of resources and training to provide adequate medical and psychological care." *Id.* Similarly, the BIA determined that "conditions in th[e] country's mental institutions are the result of limited options for controlling patients' violent behavior and a lack of resources and training—not a specific intent to inflict pain or suffering on patients." *Id.* at 487. To be sure, all of this may be cold comfort to Mr. Garcia-Botello, but the BIA's analysis conforms to, and is consistent with, the legal requirements to establish torture.

We also discern similarities between Mr. Garcia-Botello's case and *Joshi v. Garland*, 112 F.4th 181 (4th Cir. 2024). In *Joshi*, the Fourth Circuit denied a petition for review of a BIA decision denying CAT protection to "an alien with a well-documented history of debilitating and dangerous mental illnesses." *Id.* at 184. The petitioner sought

43

CAT protection on the basis that he had been subjected to "electroconvulsive therapy" when he was previously in India and would likely be subject to similar mistreatment upon his removal to that country. *Id.* at 195. The BIA had affirmed the IJ's finding that "[m]odified [electroconvulsive therapy] was not administered for the purpose of inflicting pain or torture." *Id.* (first alteration in original).

The Fourth Circuit concluded that "[s]ubstantial evidence supports the Agency's finding that Joshi's alleged torturers did not 'intentionally inflict[]' his purported pain or suffering for proscribed purposes." *Id.* (second alteration in original). The court agreed with the BIA that "Modified [electroconvulsive therapy] was not administered for the purpose of inflicting pain or torture." *Id.* (alteration in original) (quoting J.A. 102). "To the contrary," the court stated, "the record reasonably suggests that they were accepted medical interventions to *help* Joshi." *Id.* (emphasis in original). We do not take a normative position on the acceptability of the medical interventions to which Mr. Garcia-Botello may be subjected. However, akin to the petitioner in *Joshi*, Mr. Garcia-Botello's focus on the medical interventions and resulting harms that he may face in Mexico fatally truncates the legal analysis that requires a showing of specific intent by the actors: *viz.*, his argument elides the specific-intent requirement for torture by failing to show, as to the healthcare providers, that their treatments of him would be animated by anything other than good-faith intentions to aid him in a universe of limited resources and training.

In sum, Mr. Garcia-Botello has not shown that the IJ's factual finding, as affirmed by the BIA, that any individuals who would mistreat him would lack the specific intent to

torture him was not supported by substantial evidence. We therefore uphold this factual finding. Without showing specific intent, Mr. Garcia-Botello cannot establish that he faces a risk of torture; so, he cannot establish eligibility for withholding of removal under the CAT.

## D

Mr. Garcia-Botello's final argument is that the BIA erroneously applied a standard for acquiescence by the government that was more demanding than the actual standard. According to Mr. Garcia-Botello, the BIA erroneously required that he present evidence that government officials "effectively do nothing to prevent torture" in order to establish government acquiescence when, in fact, he only needed to show that government officials "regularly fail to take action to prevent or punish torture." Pet'r's Opening Br. at 52 (quoting R. at 193). Mr. Garcia-Botello contends that the BIA's application of this improperly high standard led the BIA to disregard evidence that public officials engage in precisely that behavior "through underreporting, under-investigation, under-prosecuting, and under-convicting acts of torture and . . . fail[ing] to enforce laws against discrimination or create practical changes." *Id.* at 54. Mr. Garcia-Botello contends that this is a legal error, so we review this question de novo. We hold that the BIA did not commit legal error when reviewing the IJ's government acquiescence finding.

"Acquiescence of a public official requires that the public official, prior to the activity constituting the torture, have awareness of such activity and thereafter breach his or her legal responsibility to prevent such activity." *Karki*, 715 F.3d at 806 (quoting *Cruz-Funez v. Gonzales*, 406 F.3d 1187, 1192 (10th Cir. 2005)); *accord* 8 C.F.R.

45

§ 1208.18(a)(7).  "This standard does not require 'actual knowledge, or willful acceptance' by the government. . . .  'Rather, willful blindness suffices to prove acquiescence.'"  *Karki*, 715 F.3d at 806 (quoting *Cruz-Funez*, 406 F.3d at 1192).

The basis for Mr. Garcia-Botello's argument is the IJ's statement regarding the willful blindness standard for government acquiescence that "[a]n applicant can establish willful blindness by showing that government officials are generally aware of, and yet *effectively do nothing* to prevent acts of torture."  R. at 208 (emphasis added).  As support for this proposition, the IJ cited *Karki*.  Mr. Garcia-Botello contends that *Karki* does not set such a high bar for government acquiescence, and it was error to read it as doing so.

We agree with Mr. Garcia-Botello that *Karki* (along with the rest of our caselaw) does not establish a government acquiescence standard under which a petitioner needs to show that government officials "effectively do nothing" to prevent torture.  In *Karki*, we found government acquiescence because of "Petitioner's evidence that the government *regularly fails to take action to prevent or punish* . . . acts of torture."  715 F.3d at 807 (emphasis added).  There is significant daylight between a government effectively doing *nothing* and a government regularly failing to take action.  The latter suffices to prove acquiescence.

But the IJ's misstatement does not require us to grant Mr. Garcia-Botello's petition.  First, the BIA did not endorse that framing of the legal standard, and the basis of our review is the BIA's opinion, not the IJ's.  *See Htun*, 818 F.3d at 1118 ("On appeal of a BIA order, '[t]he scope of our review is governed by the form of the BIA decision.'"  (alteration in original) (quoting *Ritonga*, 633 F.3d at 974)); *Karki*,

46

715 F.3d at 800 ("[W]e review the BIA's decision, not the IJ's . . . ."). True, we "*may* consult the IJ's opinion *to the extent that the BIA relied upon or incorporated it*." *Karki*, 715 F.3d at 800 (emphases added) (quoting *Sarr*, 474 F.3d at 790). Put another way, "when seeking to understand *the grounds provided by the BIA*, we are not precluded from consulting the IJ's more complete explanation *of those same grounds*." *Htun*, 818 F.3d at 1118 (emphases added) (quoting *Uanreroro*, 443 F.3d at 1204). But we do not assume that the BIA adopted as its own every statement the IJ made. Rather, when the BIA explicitly endorses the IJ's findings, we may consult the IJ's statements as more complete or detailed explanations of the BIA's reasoning. Here, we do not understand the BIA to have endorsed the IJ's misstatement about the standard for government acquiescence. Indeed, the BIA stated and applied the correct legal standard. *See* R. at 5 (stating the government acquiescence standard as "including the concept of willful blindness" and citing *Karki*). Therefore, we discern no error in the BIA's opinion.

Additionally, even if it could be shown (but it cannot) that there was an error in the BIA's articulation or application of the government acquiescence standard, such an error would be without legal effect since the BIA correctly found no torture to which the government could or could not acquiesce. The core finding that bars Mr. Garcia-Botello from obtaining CAT protection is that none of the mistreatment he alleges that he will experience has been shown to be animated by an actor's specific intent to cause him "severe pain or suffering, whether physical or mental." 8 C.F.R. § 1208.18(a)(1). We affirmed this finding *supra* in IV.C. Without a showing

of the perpetrators' specific intent, none of the acts Mr. Garcia-Botello fears qualify as torture under the CAT. Accordingly, whether the government acquiesces to those acts is an irrelevant inquiry, because even if it did, it would not be acquiescing to torture.

In conclusion, Mr. Garcia-Botello has not shown that the BIA erred in conducting its analysis of government acquiescence.

V

Based on the foregoing, we **deny** Mr. Garcia-Botello's petition for review.